752 So.2d 771 (1999)
STATE of Louisiana
v.
Richard D. HOBLEY.
No. 98-KA-2460.
Supreme Court of Louisiana.
December 15, 1999.
Rehearing Denied February 18, 2000.
*774 Gary Patrick Clements, Nicholas Joseph Trenticosta, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Van H. Kyzer, District Attorney, for Respondent.
CALOGERO, Chief Justice.[*]
On September 20, 1995, a Natchitoches Parish grand jury indicted defendant for first degree murder of Steven Traylor, a violation of La.Rev.Stat. 14:30. On January 30, 1996, the state filed notice of intent to seek the death penalty. On October 30, 1997, after a trial by jury, defendant was found guilty as charged. At the penalty phase of the trial later that day, the jury unanimously returned a verdict of death, finding as aggravating circumstances that defendant was engaged in the perpetration or attempted perpetration of an aggravated kidnapping and an armed robbery. Defendant now appeals his conviction and sentence raising forty-five assignments of error.[1]
For the reasons set forth below, we affirm defendant's conviction for first degree murder. However, we reverse the sentence to death and remand the case to the district court for a new penalty phase hearing.

Facts
On the evening of June 14, 1995, the victim of this murder, Steven Traylor, and his wife, Juanita, took their daughters to the park to play baseball. They arrived home at about 9:00 p.m. Mr. Traylor left the house about an hour later to close the liquor store he owned and to visit with his employees. Mr. Traylor never returned home.
The next morning, Mr. Traylor's body was discovered in his vehicle at a landfill site in Natchitoches Parish. Ballistics analysis revealed that Mr. Traylor had been shot twice and that the murder weapon had been fired from a distance of not less than one foot and not more than four feet from his body.
The ensuing investigation led police to defendant, Richard Hobley, and three accomplices. Following his arrest, defendant *775 gave a detailed confession to the crime. On the day before the murder, defendant, along with Ricky Ray Lewis, Joe Walker, Jr., and Otis Anthony, planned to rob Mr. Traylor. They believed that he would be carrying the proceeds from his business when he returned home in the evening. The men staked out the store and followed Mr. Traylor home, but they did not then execute their plan. The following day they returned and parked their car by a vacant house near Mr. Traylor's home, where Anthony, who knew Mr. Traylor, positioned himself to act as a lookout. Defendant Hobley, accompanied by Lewis and Walker, then waited for Mr. Traylor to arrive at his home. The men accosted Mr. Traylor as he pulled up in his driveway. They pretended that they needed directions, but they then demanded money. When Mr. Traylor responded that he did not have any money with him, the armed assailants ordered him out of the vehicle. Defendant Hobley instructed Lewis to immobilize Mr. Traylor with duct tape. The assailants soon noted the presence of police in the area and decided to place Mr. Traylor in the trunk of his vehicle. Unable to open the trunk, they decided to remove Mr. Traylor from the area. They ordered him into the rear seat of his vehicle, flanked on his left by Lewis and on his right by Walker, while defendant drove the vehicle.
The men returned to the vacant house, where Anthony was waiting for them. Walker then exited the Traylor vehicle and drove off with Anthony in the car in which the men had arrived. Defendant claimed that, as he was driving, with Mr. Traylor and Lewis in the back seat, a struggle for defendant's weapon ensued. During the struggle, the vehicle veered off the road and the gun went off twice, striking Mr. Taylor both times and killing him. After defendant wiped his fingerprints from the car, he and Lewis hitchhiked to Coushatta, leaving Mr. Traylor lying on the seat.
In his confession, defendant also stated that he was wanted for an incident that had occurred in Houston, Texas, and gave the interrogating officer a detailed account of his involvement in a shooting that had taken place there. After the jury convicted defendant of first degree murder, the state introduced at the penalty phase the part of his confession relating to the unadjudicated criminal conduct in Houston. The jury returned with a verdict of death.

Penalty Phase Issues
Confession to Unadjudicated Other Crimes (Assignments 5, 21, 26, and 39).
In these assignments, defendant argues that the district court erred when it admitted into evidence at the penalty phase that portion of his confession in which he described his participation in the purported Houston shooting.
In the statement defendant gave to Natchitoches Parish Deputy Sheriffs Trammell and Jones at the Red River Parish Sheriffs Office on August 12, 1995, defendant stated that he thought he was wanted for an incident in Houston. According to the statement, in Houston he and a friend had become involved in a dispute over a woman with a man named "Big Riley." They decided to ambush "Big Riley" at night, knowing that he had cash and drugs in his truck. Defendant and several other men later approached "Big Riley" as he was washing his vehicle. When "Big Riley" sprayed water in defendant's face, defendant and another man, Darrel Wayne, began shooting their guns. Though "Big Riley" threw the vehicle's keys towards him, defendant could not find them because of the water in his eyes. One of the other men, Dion, retrieved the keys. Defendant did not know whether a bullet had struck "Big Riley," only that "Big Riley" was lying down in back of the house. The men left in Riley's vehicle, while defendant followed in his own vehicle. They took Riley's vehicle to another location where they stripped it. The items removed from Riley's vehicle were stashed at defendant's residence. Upon his release from serving some jail time for unrelated *776 offenses, defendant and his cohorts sold the stolen goods to another person, who then alerted the police. While defendant was visiting a girlfriend, police officers entered defendant's residence looking for him, Darrel Wayne, and Dion. When his cousins informed him of the raid, defendant and Dion left for Shreveport. Later, Dion returned to Houston, but a relative told police of his whereabouts. After Dion in turn told police where defendant was located, defendant went to the country to hide out. He was planning to obtain the services of a lawyer before Mr. Traylor's murder. Defendant denied involvement in any other murders except for that of "Big Riley."

Capital Sentencing Hearing
In pertinent part, La.Code Crim. Proc. art. 905.2 requires that the sentencing hearing in a capital case focus on the character and propensities of the offender. The hearing shall be conducted according to the rules of evidence. La.Code Crim. Proc. art. 905.2. Beginning with State v. Sawyer, 422 So.2d 95, 104 (La.1982), a slim majority of this court held that Article 905.2 authorizes the introduction at a capital sentencing hearing of evidence of convictions for unrelated crimes, even if the defendant does not place his character at issue. Evidence of the prior conviction was not only relevant, but also competent and reliable. Id. at 103-04; see also State v. Jordan, 440 So.2d 716 (La.1983).
As to evidence of unrelated and unadjudicated criminal conduct, the court in State v. Lowenfield, 495 So.2d 1245 (La.1985), found a bill of information charging the defendant with an unrelated crime not to be competent evidence of the defendant's character, as required by the mandate in Article 905.2 that the hearing shall be conducted in accordance with the rules of evidence. The court next held that fundamental fairness dictated that an accused receive adequate prior notice that evidence of unrelated criminal conduct might be offered by the state in the penalty phase. State v. Norton Hamilton, 478 So.2d 123, 132 (La.1985). Finally, in State v. Ward, 483 So.2d 578, 588-89 (La.1986), a majority expanded the category of admissible evidence in the capital sentencing hearing to include evidence of other crimes with which the defendant had been charged but of which he had not been convicted. The majority reasoned that the crimes with which the defendant was charged had been dismissed as the result of a guilty plea and that other testimony was introduced concerning acts in the dismissed charges by the same family members who were victims of the sex crimes identical to those for which the defendant was then being tried. Ward, 483 So.2d at 588-89.
The court eventually recognized the necessity of standards governing the admission in the penalty phase of evidence of unrelated and unadjudicated criminal conduct such as had been set forth in State v. Prieur, 277 So.2d 126, 129 (La.1973), with regard to the admission of other crimes evidence in the guilt phase of trial. State v. Brooks (Brooks I), 541 So.2d 801, 803 (La.1989). Thus, we held in Brooks I that, before the state in its case-in-chief in the penalty phase may introduce evidence of unrelated and unadjudicated criminal conduct, the trial judge must determine that: (1) the evidence of the defendant's commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities. Brooks I, 541 So.2d at 814. This holding was further restricted in State v. Jackson, 608 So.2d 949, 954-56 (La.1992), to evidence of conduct that involves violence against the person of the victim and for which crime the period of limitation for instituting prosecution has not run at the time of the indictment of the accused for the first degree murder. Jackson, 608 So.2d at 955; State v. Connolly, 96-1680, p. 14 (La.7/1/97), 700 So.2d 810, 820.

*777 Applicable Legal Precepts

The instant case presents the situation wherein the state seeks to introduce into evidence at the penalty phase the defendant's confession, the only evidence as to unrelated and unadjudicated criminal conduct. At a pre-trial hearing on various motions, the state informed the district court that it had filed notice with defense counsel of its intention to introduce at the penalty phase evidence of the alleged Houston murder. Defense counsel responded that he would not object to such evidence until the penalty phase, because he did not expect the trial to reach that phase. Accordingly, the district court did not then rule on the matter. However, before the penalty phase commenced, defense counsel did object, claiming that the portion of defendant's statement in which he implicated himself in the Houston murder did not prove his culpability for the offense by clear and convincing evidence. The district court denied the motion. Though the court was "reluctant to admit [the confession] since it was not a conviction," it felt constrained by this Court's ruling in State v. Marcus Hamilton, 92-1919 (La.9/5/96), 681 So.2d 1217.
In Hamilton, this Court held the defendant's confession to an unadjudicated murder admissible in the penalty phase. Following the jury's verdict of guilty of the first degree murder of Father McCarthy, the state sought to introduce in the penalty phase the defendant's confession to the unrelated and unadjudicated murder of William Chattman. At a hearing outside the presence of the jury, the detective who had interviewed the defendant while he was under arrest for McCarthy's murder testified that defendant waived his rights and agreed to talk about Chattman's murder, to which he ultimately confessed. The detective testified that there had been no force, promises, threats, or inducements. The trial court ruled the confession admissible, finding that the confession was competent and reliable and that the evidence was clear and convincing as to defendant's guilt of the unrelated murder. On appeal, this court found no merit to the defendant's claim that he was incompetent at the time he gave the confession. The Court also found no merit to the defendant's claim that the jury's focus in the penalty phase was impermissibly shifted by the extent of the state's evidence, which consisted of the testimony of the detective who had taken the confession and the confession itself.[2] This court affirmed the sentence.
In the case before us, the state urged the district court, as it now urges this court, to follow Hamilton, which does support the general proposition that a confession to an unadjudicated crime may be admitted in evidence in the penalty phase. The Hamilton court, however, was not called upon to make a specific finding that the evidence of the defendant's involvement in the unadjudicated crime, consisting solely of the defendant's confession, was otherwise reliable and sufficient to prove by clear and convincing evidence that the defendant had committed the unadjudicated murder. There was little doubt that the confession was reliable or that the evidence was clear and convincing, because, in his closing argument in the penalty phase, Hamilton's counsel conceded that his client had committed the unadjudicated murder of Chattman. Hamilton, 92-1919, p. 5, 681 So.2d at 1222. Counsel then pointed out for the jurors' consideration as a mitigating circumstance the fact that the trial judge had declared Hamilton to be incompetent to proceed to trial for Chattman's murder. Id. Thus, Hamilton did not reach the issue presented in the instant case.
Defendant correctly argues that our decisions in Connolly, supra, and State v. Brooks (Brooks II), 92-3331 (La.1/17/95), *778 648 So.2d 366, which the district court did not address, control the issues raised here: whether the evidence introduced by the state in the penalty phase was competent and reliable and whether this evidence was sufficient to prove by clear and convincing evidence that defendant committed the unadjudicated Houston murder. Defendant contends that the portion of his statement concerning the Houston incident, without extrinsic evidence that he had committed the crime or that a murder had even occurred, was unreliable and untrustworthy and, therefore, should not have been admitted in evidence at the penalty phase.[3] Defendant thus maintains that the district court erred in admitting an insufficiently substantiated statement of unadjudicated criminal conduct that the state offered in order to demonstrate his deficient character and dangerous propensities.
In Brooks II, the state introduced in the penalty phase the defendant's confession as the sole evidence of various unadjudicated crimes. We acknowledged that, under the corpus delicti rule, a criminal defendant cannot be convicted based on his own uncorroborated confession without some extrinsic proof that a crime has in fact been committed. 92-3331, p. 19 n. 19, 648 So.2d at 376 n. 19 (citing State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190; State v. Cruz, 455 So.2d 1351 (La. 1984)). However, as to the admission of other crimes evidence in the penalty phase, we stated:
While we are unprepared to say that extrinsic corroboration of unadjudicated other crimes contained in a defendant's confession is a necessary predicate to the admission of that confession in the penalty phase of a capital trial, we do note that such corroboration is a traditional and time-honored method of demonstrating the trustworthiness of such statements. Such guarantees of trustworthiness are particularly necessary in capital cases where the risk of fabrication or inaccuracy must be viewed with an eye towards the question to be determined by the trier of fact.
Brooks II, 92-3331, pp. 18-19, 648 So.2d at 376-77 (footnote omitted). The question to be answered, of course, is whether the defendant should be sentenced to death.
We next addressed the issue in Connolly, wherein the state also introduced at the penalty phase the defendant's confession to unadjudicated criminal conduct as to which no other evidence was presented. After again acknowledging that an accused may not be convicted of a crime based solely on his own uncorroborated confession without some independent proof that a crime has been committed, we reasoned that, because only the appropriate sentence is at issue in the penalty phase of a first degree murder trial, the corroboration test is not necessary to facilitate introduction of evidence of other crimes in the penalty phase of a capital trial. 96-1680, pp. 14-15, 700 So.2d at 820. Nonetheless, relying on our recognition in Brooks II that a different confession-corroboration test is applied to other crimes evidence introduced at the penalty phase, 96-1680, p. 15 nn. 8, 9, 700 So.2d at 820-21 nn. 8, 9, we held in Connolly that:
if the confession is reliable and trustworthy, then it alone may be sufficient to satisfy the clear and convincing evidentiary standard. However, in evaluating the reliability and trustworthiness of a defendant's confession for the admission of it at the penalty phase, one must also consider the circumstances surrounding the confession and the crime to which the defendant confessed. For example, *779 the confession may be unreliable and untrustworthy if it is the product of police coercion or if there is no extrinsic proof that a crime even occurred.
96-1680, p. 15, 700 So.2d at 821 (emphasis in original)(footnote omitted).
Under Brooks II and Connolly, therefore, the state, in order to introduce a confession in the penalty phase as the sole evidence of unrelated and unadjudicated criminal conduct, must show the district court that the evidence is competent and reliable by demonstrating the trustworthiness of the statement. Voluntariness is not the sole indicator of reliability and trustworthiness, because the district court must consider not only the circumstances surrounding the confession but also the crime to which the defendant has confessed and whether that crime has even occurred. Connolly, 96-1680, p. 15, 700 So.2d at 821; Brooks II, 92-3331, pp. 18-19, 648 So.2d at 376-77. Brooks II and Connolly thus rightly set the measure for the admission of a confession to unadjudicated other crimes before the jury may consider such evidence in its determination of whether to impose the ultimate penalty of death. See Brooks II, 92-3331, pp. 18-19, 648 So.2d at 376-77.

Analysis
In Brooks II, the defendant confessed to four murders for which he had already been convicted, the two murders for which he was being prosecuted, two murders for which he was under indictment, and some nineteen separate incidents involving twenty-seven other unadjudicated offenses. With regard to twenty-three of the unadjudicated offenses, the state presented no evidence corroborating even the fact that the crimes had taken place. The state called no victims or eyewitnesses to testify, offered no indictments or bills of information to verify that these offenses were being prosecuted, and failed to present any evidence that the police had matched the alleged incidents to any unsolved cases or reported incidents.
On these facts, we held that the trial court erred in finding that these portions of the defendant's confession were reliable enough to meet the standard articulated in Brooks I. We reasoned that the state's inability to verify even the occurrence of many of the purported offenses contained in the confession "raise[d] the possibility that many of the crimes Brooks claimed he committed may never have occurred." 92-3331, p. 18, 648 So.2d at 376; see also Connolly, 96-1680, p. 15 n. 9, 700 So.2d at 821 n. 9. Although we found Brooks competent to stand trial and capable of understanding and waiving his rights under Miranda, we noted that these findings did not lessen the chances that the defendant could have "voluntarily inflated the scope of his crime spree at the time of his confession." Brooks II, p. 18, 648 So.2d at 376 The circumstances were such that the possibility of at least some exaggeration on the defendant's part was of legitimate concern. We further observed that corroboration of these offenses, "if available and produced, would likely have cured the defects..." that caused the defendant's statement to fail the Brooks I test. Id. Thus, the state's evidence, consisting of the defendant's admissions, was not shown to be otherwise competent and reliable and did not clearly and convincingly prove that the defendant committed the unadjudicated offenses.
In Connolly, the defendant confessed to the murder of nine-year-old Shane Pullen. After returning to the scene of that crime with the police, the defendant was asked by a police officer whether he had earlier killed twelve-year-old Lawrence Topham. The defendant responded by admitting to the unrelated murder of Lawrence, eventually giving a taped confession detailing how he had killed Lawrence. The defendant later recanted that confession, claiming he had confessed out of self-loathing to ensure that he would be sentenced to death for the murder of Shane. When the state sought to introduce the confession to the murder of Lawrence in the penalty *780 phase, the defendant objected, arguing that the state could not prove the corpus delicti of the crime by evidence independent of the confession.
We ultimately found the defendant's confession to the unrelated murder admissible at the penalty phase of the trial, because the circumstances surrounding the confession and Lawrence's death demonstrated the defendant's connection by clear and convincing evidence. We reasoned that there was sufficient extrinsic corroboration of the confession to conclude that it was reliable and trustworthy: (1) the confession had not been coerced, (2) the defendant had also confessed to his attorney, his family members, and his pastor, (3) an eyewitness placed him at the scene of Lawrence's murder, and (4) a forensic pathologist testified that Lawrence, whose death was identified in the autopsy report as an accidental drowning, could have been strangled in the manner described by the defendant in his confession. 96-1680, p. 16, 700 So.2d at 821. With this corroborating evidence, we found the statement reliable and trustworthy, and we concluded the state had clearly and convincingly established that the defendant had committed the unadjudicated murder. Thus, the trial court, after a full hearing on the matter, had properly admitted the statement in evidence at the penalty phase.
In the instant case, the state alleged in the Notice of Aggravating Circumstances that defendant had "committed another murder in Houston, Texas, charged by Harris County authorities, of an individual named Riley." The state did not allege the date of the other crime or the full name of the victim. Prior to the penalty phase, when defendant objected to introduction of the confession, this allegation was again mentioned. However, the state at that time did not introduce any evidentiary support for this allegation. At the hearing on defendant's motion for new trial, the state, again urging the district court to follow Hamilton, indicated it could have submitted evidence of the Texas charge, but it once more chose not to do so. Unlike in Hamilton, defendant's trial counsel never conceded his client's involvement in any unadjudicated offense. The record contains no evidence that defendant has ever been charged for the Houston crime, that the Houston crime even occurred, or that an individual named "Big Riley" had even existed, much less that he was the victim of a murder.
At the motion for new trial, the trial judge did address the issue of whether the state had met its burden of proof before introducing the statement.[4] The court found that, considering the details defendant provided in the confession, the state had met its burden of proving the unadjudicated conduct by clear and convincing evidence. However, these are unsubstantiated details culled from the statement itself. As such, they do not address the reliability and trustworthiness element as elaborated in Brooks II and Connolly. In Connolly, by contrast, the details of the defendant's statement were in fact corroborated by other evidence and testimony; accordingly, we deemed that statement to be trustworthy and reliable.
In this case, the only evidence of the unadjudicated other crime was that portion of defendant's statement describing his participation in a shooting in Houston, Texas. Accordingly, before the state could *781 introduce only this statement in the penalty phase to satisfy its burden of proving by clear and convincing evidence that the defendant committed the unadjudicated murder, the state also had to demonstrate that the evidence was otherwise competent and reliable. Brooks I, 541 So.2d at 814. The state was thus required to demonstrate the trustworthiness of that statement by showing that it was voluntarily made and that the alleged other crime was committed. Connolly, 96-1680, p. 15, 700 So.2d at 821; Brooks II, 92-3331, pp. 18-19, 648 So.2d at 376-77. If the state establishes that the statement is reliable and trustworthy, the court then determines whether the statement alone under the evidentiary standard of Brooks I clearly and convincingly proves that the defendant committed the other crime.[5]See Connolly, 96-1680, p. 15, 700 So.2d at 821.
Here, we cannot conclude, as we did in Connolly, that the state has demonstrated that defendant's statement describing his participation in the Houston incident was reliable and trustworthy. Such a statement is not admissible in the penalty phase as reliable and trustworthy if it was the product of coercion or if there is no evidence proving that the crime occurred. Connolly, 96-1680, p. 15, 700 So.2d at 821. We note that Deputy Trammel's testimony regarding the taking of defendant's statement does demonstrate that the confession was voluntary and not the result of coercion. Notwithstanding the voluntariness of the statement, no evidence other than the confession itself tended to show that the Houston shooting as described by defendant in his statement even occurred or that defendant's purported actions in firing his gun when the alleged victim squirted him with a water hose resulted in the victim's death. See Id. Unlike the prosecution in Connolly, the state here did not introduce evidence that "Big Riley" was killed in a shooting or that the defendant was present at the scene of the alleged murder. The state introduced neither the testimony of eyewitnesses to the killing of "Big Riley" nor an indictment verifying that the alleged murder of "Big Riley" was being prosecuted Cf. Brooks II, 92-3331, p. 17, 648 So.2d at 376. Absent extrinsic evidence linking defendant to the alleged crime, we cannot say that defendant's admission to the unadjudicated crime was neither the result of braggadocio nor, as his sister suggested in her testimony, an attempt to protect a sibling.
That this defendant probably committed the alleged Houston crime is not the burden of proof placed upon the state in capital sentencing hearings. The state must prove by clear and convincing evidence that the defendant committed the other crime, and that evidence must be competent and reliable. Brooks II and Connolly established the baseline for determining the reliability and trustworthiness of a confession to other crimes evidence introduced at the penalty phase. Under this "confession-corroboration test," Connolly, 96-1680, p. 15 n. 8, 700 So.2d at 820 n. 8, the state must show that the confession was not the product of police coercion and that the crime actually occurred. Applying that test and contrasting the facts of the instant case with those in Brooks II and Connolly, we conclude the state failed to demonstrate the reliability and trustworthiness of that portion of defendant's confession describing his involvement in the alleged Houston incident. Therefore, the district court erred in allowing this portion of the defendant's statement to be introduced in evidence at the penalty phase and in finding that this evidence satisfied the clear and convincing evidentiary standard of Brooks I.
We further find that the erroneous introduction in the penalty phase of that portion of defendant's statement concerning the Houston incident was not harmless. We have repeatedly recognized that evidence that establishes the defendant in the *782 recent past has engaged in criminal conduct involving violence to the person is "highly probative" of the defendant's character and propensities. E.g., State v. Comeaux, 93-2729, p. 11 (La.7/1/97), 699 So.2d 16, 22. Because the statement linked defendant to another murder that occurred during the perpetration of an armed robbery, and because it was the only evidence of other crimes introduced by the state, the evidence, which certainly portrayed defendant as a "bad man," must have contributed to the jury's decision to render a sentence of death. Because the error incurably tainted the sentencing process, we cannot conclude that the defendant's death sentence "was surely unattributable to the error." See State v. Code, 627 So.2d 1373, 1384 (La.1993)
Accordingly, we reverse defendant's sentence of death and remand the case for a second penalty phase hearing.

Guilt Phase Issues
State's Peremptory Challenges and Batson v. Kentucky (Assignment 24)
In this assignment, defendant argues the state impermissibly exercised its peremptory challenges to exclude potential jurors Martin Brown, Ezekiel Jewett, Jr., Wanda Sykes, and Wilmer Bell because they were African-American. Therefore, he asserts he is entitled to a new trial pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
In defendant's case, the state exercised six of its nine peremptory challenges against black prospective jurors; the jury was composed of four black jurors and eight white jurors. The trial court noted that the racial composition of the jury was equivalent to the racial composition of the district.
Under Batson, a defendant must first establish a prima facie case of discrimination by showing facts and relevant circumstances that raise an inference the prosecutor used his peremptory challenges to exclude potential jurors on account of race. The burden of production then shifts to the state to come forward with a race-neutral explanation. If a race-neutral explanation is tendered, then the trial court must determine whether the defendant has established purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995)(per curiam); State v. Green, 94-0887, p. 23 (La.5/22/95), 655 So.2d 272, 287. To be facially valid, the prosecutor's explanation need not be persuasive, or even plausible; thus, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Purkett, 514 U.S. at 767-68, 115 S.Ct. at 1771. Faced with a race-neutral explanation, the defendant then must prove to the trial court purposeful discrimination. Id. at 768, 115 S.Ct. at 1771 (citing Batson, 476 U.S. at 98, 106 S.Ct. at 1723; Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 1865, 114 L.Ed.2d 395 (1991) (plurality opinion)).
In this case, the court entertained the state's race-neutral reasons for the exclusions without making a finding as to whether defendant first made a prima facie showing of purposeful racial discrimination. In such a situation, the issue of whether the defendant established a prima facie case of discrimination is moot. Green, p. 25, 655 So.2d at 288 (quoting Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866). We thus turn to whether the state tendered race-neutral explanations for the exercise of its peremptory challenges.
As to Martin Brown, the prosecutor stated that Brown "seemed disinterested in the case, and ah ... did not seem to be paying attention to me." The court accepted the race-neutral basis for the peremptory challenge. As to Wanda Sykes, the prosecutor explained that Sykes appeared more attentive to the defense than to the state during the voir dire process. The trial judge asked the prosecutor if he was aware that Sykes had lived with or dated a convicted felon at one time; the *783 prosecutor responded that he knew of Sykes but that he had no specific knowledge of her background. The court accepted the state's race-neutral justification for challenging the prospective juror. As for Ezekiel Jewett, Jr., the prosecutor claimed that "obviously while none of the... jurors appeared happy to be here, [Jewett] didn't seem to be very interested in the process." Again, the court accepted the state's race-neutral explanation for the strike. Finally, in articulating his reasons for exercising a peremptory challenge to excuse Wilmer Bell, the prosecutor noted that the prospective juror's brother, Willie Bell, had been convicted two months earlier of second degree murder and that the prospective juror had testified at trial. The trial court acknowledged that the prospective juror's brother had been convicted of murder during the last jury term and that the prospective juror had testified at trial. Thereafter, the court accepted the state's basis for the challenge.
The state's tendered reasons are facially race-neutral. They contain none of the cultural, geographic, or linguistic classifications that, because of the case with which such classifications may serve as a proxy for an impermissible classification, necessitate careful scrutiny. A perceived lack of interest in the court proceedings, dissatisfaction with the jury selection process, inattentiveness to the prosecution, and testifying in the murder trial of a relative are qualities not readily associated with the suspect class that is alleged to be the object of the prosecutor's discriminatory use of peremptory strikes, i.e., prospective African-American jurors. See Green, 94-0887, p. 26, 655 So.2d at 289. Thus, the state has carried its burden of articulating race-neutral reasons for the exercise of its peremptory strikes. Whether these reasons are both substantial and supported by the record is a question to be determined in the last stage of the Batson analysis.
The proper inquiry in the final stage of the Batson analysis is whether the defendant's proof, when weighed against the prosecutor's proffered race-neutral reasons, is sufficient to persuade the trial court that such discriminatory intent is present. Green, 94-0887, p. 29, 655 So.2d at 290. Thus, the focus of the Batson inquiry is upon the intent of the prosecutor at the time she exercised her peremptory strikes. Id., p. 24, 655 So.2d at 287. The trial court should examine all of the available evidence in an effort to discern patterns of strikes and other statements or actions by the prosecutor during voir dire that support a finding of discriminatory intent. State v. Tyler, 97-0338, p. 4 (La.9/9/98), 723 So.2d 939, 942-43. Because the factual determination pertaining to intentional discrimination rests largely on credibility evaluations, the trial court's findings are entitled to great deference by the reviewing court. State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832 (citing Batson, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21).

Prospective Jurors Martin Brown and Ezekiel Jewett, Jr.
The defendant argues that the state's explanations that Brown and Jewett were challenged based on their perceived disinterest in the case, dissatisfaction with the jury selection process, or lack of attentiveness toward the prosecutor are merely pretextual and belie the prosecutor's discriminatory intent to preclude black venire members from serving on the petit jury. We do not disagree that the generality of an explanation such as inattentiveness for the striking of venire members merits concern.[6] However, a peremptory challenge *784 based on the body language of a prospective juror does not violate Batson when accepted by the trial judge, who possesses broad discretion in making the ultimate factual determination regarding purposeful discrimination. See, e.g., United States v. Bentley-Smith, 2 F.3d 1368, 1375 (5th Cir.1993).[7]
Here, nothing in the record undermines the determination of the district court that the prosecutor's stated reasons for exclusion were legitimate grounds for exercise of the challenges against Brown and Jewett. In this case, where the prima facie showing was presumed because the state was asked to tender explanations for the challenges, defendant cannot simply rest on a written record and require that we second guess the trial judge's credibility determinations, which are necessarily based on his visual observations. Notably, trial counsel neither disputed the explanations of inattentiveness given by the prosecutor nor developed a record of evidence contradicting those explanations.
In determining whether there was purposeful discrimination, the trial judge may consider the legitimacy of the state's race-neutral reasons for excluding other prospective jurors. Hernandez, 500 U.S. at 370, 111 S.Ct. at 1872. With regard to the remaining black prospective jurors, the state gave reasons not based on lack of attentiveness. As to Sandra Brew, the state explained that, although Brew indicated she could vote for the death penalty, she had some hesitation about doing so. As to Claude Brooks, the state explained that it had initially accepted Brooks as a juror, but the state later struck him, because he had "vacillat[ed] back and forth" on the presumption of innocence and whether he would want to hear the defendant testify. The record contains support for both of these explanations. Also, we have carefully reviewed the transcript of voir dire and can find no questions or statements by the prosecutor in exercising his challenges that support an inference of purposeful discrimination. See State v. Collier, 553 So.2d 815, 819 (La.1989). Accordingly, the defendant has failed to carry his burden of proving purposeful discrimination with regard to prospective jurors Brown and Jewett.

Prospective Jurors Wanda Sykes and Wilmer Bell
With respect to prospective juror Sykes, defendant argues that the trial court, by asking the prosecutor if he was aware Sykes had been living with or dating a convicted felon, essentially preempted the state from having to tender a race-neutral explanation and precluded the defense from establishing the validity of the trial court's information. The prosecutor answered the court, saying that he knew of Sykes but did not know specifically of her background.
Though the trial court's personal knowledge of Sykes may have prompted its query, the fact remains that the trial court accepted the state's explanation that Sykes seemed more attentive to the defense than to the prosecution. As noted above, defendant does not direct our attention to any evidence in the record that discredits that finding. As with prospective jurors Brown and Jewett, the trial judge was in the best position to know if the reason tendered had merit. Because the trial record cannot reflect the attentiveness of the venire members during voir dire, we defer to the trial court's determination that the explanation given was reasonable, not a pretext, and legitimately related to the particular case. Thus, defendant has failed to carry his burden of proving purposeful discrimination *785 with regard to prospective juror Sykes.[8]
With regard to Bell, defendant argues the trial court erred in accepting the state's challenge based on information not elucidated during voir dire. Defendant relies primarily upon State v. Knighten, 609 So.2d 950 (La.App. 4th Cir.1992). In that case, two jurors were peremptorily challenged on the prosecutor's stated basis that they each had prior arrests. This information was not brought out during voir dire examination. Defense counsel opposed the challenges, noting that he did not have the rap sheets for these venire members and that he did not know of any prior arrests. Before finding that the trial court had erred in accepting the prior arrests as legitimate race-neutral reasons for the state's challenges, the Fourth Circuit held that the state must provide the defense with evidence of the prior arrest records if the defense requests further proof. 609 So.2d at 957.
That case is inapposite to the facts in the case before us. First, defense counsel neither disputed the prosecutor's explanation that prospective juror Bell had testified in the earlier trial of his brother for murder nor requested proof that Bell had done so. Second, the trial court confirmed the prosecutor's information, noting that the trial had been conducted in that same court two months earlier. Third, defense counsel did not object to the trial court's taking judicial notice of the facts asserted by the prosecutor. Because defendant has not shown that the prosecutor's tendered reason was unreasonable, pretextual, or not legitimately related to the case, he has failed to prove purposeful discrimination with respect to prospective juror Bell.[9]
This claim lacks merit.
Exculpatory Evidence and Brady v. Maryland (Assignments 2, 13, 14, and 15)
In these assignments, defendant first contends the court erred when it did not order the state to turn over psychiatric evidence in its possession that would have demonstrated he lacked the mental capacity to proceed or that would have supported mitigating factors in the penalty phase. Alternatively, he alleges the state suppressed such evidence, because the state was in a better position than defense counsel to know about defendant's treatment at the Natchitoches Mental Health Clinic.
The prosecutor may not suppress evidence which is favorable to the accused and material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Sullivan, 596 So.2d 177 (La.1992).
Here, defendant alleges the state had in its possession his mental health records or, at the least, was aware that he was receiving treatment at the Natchitoches Mental Health Clinic. However, even though Natchitoches Parish Jail and Detention Center personnel may have been aware of defendant's visits to the mental health clinic, no evidence in the record suggests the district attorney's office had access to or possession of defendant's mental health records from the clinicrecords that were generated while defendant was awaiting trial. Because defendant would *786 have had knowledge of the treatment he received at the mental health clinic, this information cannot be said to have been suppressed by the state. Brady proscribes only the withholding of favorable and material evidence from the defense. See Coe v. Bell, 161 F.3d 320 (6th Cir. 1998), cert. denied, ___ U.S. ___, 120 S.Ct. 110, 145 L.Ed.2d 93 (1999).[10] Defendant's arguments, instead, go to his competency to assist counsel or to his claim that counsel provided ineffective assistance, rather than the state's alleged breach of its duty to disclose favorable evidence to the defense. Accordingly, this portion of defendant's suppression claim lacks merit.
Defendant next asserts the state failed to disclose a statement made by another inmate suggesting defendant had indicated that he intended only to kidnap Mr. Traylor, as opposed to killing him.
Notwithstanding the open-file discovery afforded to him, defendant complains specifically about the state's failure to label as exculpatory the information contained in the state's answer to his motion for a bill of particulars, in which the state alleged defendant made a statement to another inmate in the jail indicating that he intended to hold Mr. Traylor hostage. Defendant argues such evidence could be used to disprove the state's argument that he possessed the intent to kill or to inflict great bodily harm upon Mr. Traylor, a necessary element for a jury to return a conviction of first degree murder beyond a reasonable doubt. Accordingly, defendant claims that, by failing to produce the statement in its entirety or to label the evidence as exculpatory, the state violated Brady.
This argument lacks merit. That the state did not introduce at trial evidence of defendant's alleged admission of intent to hold Mr. Traylor hostage in no way suggests that it was in possession of any exculpatory evidence. The intent to hold a victim hostage is not mutually exclusive of a simultaneous or subsequent intent to kill or to inflict great bodily harm upon the same victim. Moreover, given that the prospective witness also stated that defendant "told him he executed the victim and left him to die," we cannot say that this evidence would have been favorable to the defense.
These assignments lack merit.
Defendant's Capacity to Proceed (Assignments 16 and 42)
In these assigned errors, defendant first claims the court erred when it did not assess his competency before or during trial.
La.Code Crim. Proc. art. 642 provides that a defendant's mental incapacity to proceed may be raised at any time by the defense, the state, or the trial court, though it is ordinarily urged by the defense. Furthermore, La.Code Crim. Proc. art. 643 requires the trial court to order a mental examination "when it has reasonable ground to doubt the defendant's mental capacity to proceed." The ordering of a mental examination, however, falls within the sound discretion of the court. State v. Clark, 367 So.2d 311, 313 (La.1979). The trial court's ruling will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Wilkerson, 403 So.2d 652, 658 (La.1981). Even if the defendant urges insanity as a defense, there must be sufficient evidence to raise a reasonable doubt as to such capacity before the article's mandate is activated. Clark, 367 So.2d at 313. Moreover, there must be substantial doubt as to mental capacity before refusal to order an examination constitutes an abuse of the trial court's discretion. Id.
*787 The question of whether the defendant was deprived of his due process right to a determination of his competency contemporaneous to trial turns on whether the trial judge received information that, if objectively considered, should reasonably have raised a doubt about defendant's competency and alerted the judge to the possibility that the defendant could neither understand the proceedings nor appreciate their significance, nor rationally aid his attorney in his defense. State v. Snyder, 98-1078, pp. 17-18 (La.4/14/99), 750 So.2d 832, 846 (citing Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir.1980)).
After considering the record presented for our review, we can find no reasonable ground to doubt the defendant's mental capacity to proceed that existed prior to sentencing. Therefore, we discern no abuse of the trial court's sound discretion in not ordering a competency hearing. First, five different attorneys represented defendant throughout the proceedings and none moved for a competency hearing. In addition, defendant tendered only a plea of not guilty to the charge, rather than a dual plea including not guilty by reason of insanity. Though defendant apparently received psychiatric treatment while awaiting trial, a fact learned by defense counsel after sentencing, nothing in the record suggests the district court was or should have been on notice of any mental or cognitive shortcomings.
Defendant alleges the court should have ordered a competency hearing when it received a letter addressing defendant's mental impairments from Dr. Oscar Bienvenu, his treating physician, after the jury had returned verdicts in both the guilt and penalty phases but before formal sentencing.[11] The court responded to the letter with a handwritten note stating that, in accordance with the jury's verdict, it had no discretion but to sentence defendant to death.[12]
In his brief letter to the court, Dr. Bienvenu spoke only as a concerned citizen and provided none of the medical information he later outlined in the affidavit attached to appellate counsel's brief. That information, including a diagnosis of defendant as psychotic and a medical history documenting auditory and visual hallucinations, was not presented to the court before sentencing. Defendant thus fails to show any abuse of discretion by the district court in proceeding with sentencing.
As a result, defendant's claims that the court erred by failing to ascertain his capacity to proceed lacks merit.
Motion to Suppress Confession. (Assignments 1, 12, 20, 22, 23, 25, and 33)(Assignment 11, unargued).
In these assignments, defendant alleges the trial court erred when it did not suppress his recorded inculpatory statement concerning the murder of Mr. Traylor.
Before introducing a confession into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1, Section 13 of the Louisiana Constitution and the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State v. Simmons, 443 So.2d 512 (La.1983). In Miranda, the U.S. Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating *788 a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.
In addition, once a suspect in custody expresses a desire, at any stage in the process, to deal with the police only through counsel, all questioning must cease, and the accused may not be subject to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police and validly waives his earlier request for counsel. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); Miranda, 384 U.S. at 444-45, 86 S.Ct. at 1612. Miranda and Edwards are prophylactic rules designed to protect an accused against the inherently compelling pressures of custodial interrogation, whether by police badgering, overreaching or subtle but repeated efforts to wear down an accused's resistance and make him change his mind. Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), reaffirmed Edwards, stating that "when counsel is requested, interrogation must cease; and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Id. at 153, 111 S.Ct. at 491.
Louisiana adheres to these same principles. When an accused invokes his right to counsel, the admissibility of a subsequent confession or incriminating statement is determined by a two-step inquiry: 1) did the accused initiate further conversation or communication; and 2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. State v. Abadie, 612 So.2d 1, 5 (La.1993). Thus, the questions presented in this case are whether defendant invoked his right to counsel, and, if so, did he initiate further contact with the police and did he knowingly and intelligently waive his right to counsel.
Defendant was arrested in Shreveport on August 11, 1995, and was initially questioned by Larry Vaughn, an officer with the Natchitoches Police Department. Vaughn administered Miranda warnings at the Shreveport Police Department, and defendant signed a waiver in his presence. According to Vaughn, defendant did not invoke his right to counsel; instead, he denied knowledge of, and involvement in, Mr. Traylor's murder.
Travis Trammel, an investigator with the Natchitoches Parish Sheriffs Office, had assisted in arresting defendant in Shreveport. He briefly observed Vaughn interview defendant. During that initial interrogation, Trammel assumed that defendant had exercised his right to counsel, but he did not know if "that opinion was based on fact."
Defendant was next transferred from Shreveport to Red River Parish by Trammel;[13] Vaughn did not participate in the transfer. According to Larry Rhodes, an officer with the Red River Parish Sheriffs Office, defendant was incarcerated in the Red River Parish jail on August 12, 1995, at 12:20 a.m. The officer estimated that defendant's holding cell was approximately twelve by eight feet with concrete walls, had a window in the door, and contained a mattress and blanket. At about 8:50 p.m. that evening, Rhodes received a jail slip indicating defendant wished to speak with him about the Natchitoches crime. When Rhodes arrived, defendant began to discuss the murder. The officer informed defendant he would need to speak with a Natchitoches officer. Rhodes then telephoned the Natchitoches Police Department and informed an officer there that *789 defendant wished to discuss Mr. Traylor's murder. Rhodes did not wait for Natchitoches officers to arrive and did not participate in the subsequent interview.
Trammel testified that he received a telephone call from Rhodes, who indicated that defendant wished to discuss the crime After arriving at the jail, but before taking defendant's statement, Trammel administered Miranda warnings and obtained a written waiver from defendant. At the beginning of the recorded interview, Trammel again advised defendant of his Miranda rights. Trammel testified he was not surprised to learn that defendant wanted to talk about the crime after being transferred to Red River Parish, because, as the men traveled there, defendant had asked questions about what information the police had in their possession and had hinted at his involvement in the murder.
Defendant testified at the suppression hearing that he requested an attorney following his arrest in Shreveport and that the officers told him they would not allow him to consult a lawyer until after he made a statement concerning the crime. He stated that he later requested to talk to Natchitoches detectives after being detained at the Red River Parish jail, because "they wasn't going to let me talk to a lawyer till I talked to them." Defendant also insisted that he had been incarcerated in Red River Parish for three or four days before he requested to speak with the Natchitoches detectives. His written waiver, however, indicated he had been there for approximately sixteen hours.
At the conclusion of the evidence, the trial court denied the motion to suppress, stating, "The testimony herein leads the Court to conclude that this confession was freely and voluntarily given, [and] that all the rights of Mr. Hobley were protected...." The court also found that "the testimony given by Mr. Hobley is not reliable, and that given by the officers is reliable."
In this case, even accepting defendant's testimony that he requested counsel after his arrest in Shreveport, we find that he initiated further communication by making the written request to discuss the crime. Under the totality of the circumstances, we can discern nothing in the record at that stage in the proceedings that suggests defendant's waiver of counsel was anything but knowing and voluntary. As a result, the trial court did not err when it determined that defendant was not deprived of his constitutional right to counsel.
In addition, La.Rev.Stat. 15:451 requires that before a statement can be introduced into evidence, the state must affirmatively show that it was free and voluntary, and not the result of fear, duress, intimidation, menace, threats, inducements, or promises. State v. Simmons, 443 So.2d 512 (La.1983).
In defendant's case, Rhodes and Trammel both testified that defendant initiated the communication about the crime, that they advised him of his rights, and that they obtained a signed consent from defendant to interrogate him without an attorney present. The state's documentary evidence also indicates that defendant initiated contact with the officers and that his confession was not obtained illegally. Finally, even defendant's testimony on direct at the motion to suppress hearing does not suggest that his confession was the product of police coercion.[14]
*790 Under these circumstances, the court did not abuse its discretion when it found that the state affirmatively demonstrated that defendant's statement had been free and voluntary, and not the result of fear, duress, intimidation, menace, threats, inducements, or promises. Although defendant on appeal now contends the court should have taken into account his low IQ and psychosis before ruling, trial counsel made no such argument.[15] Accordingly, the trial court did not abuse its discretion in denying the motion to suppress.
Defendant's claims about the admissibility of his inculpatory statement concerning the crime lack merit.
Specific Intent (Assignments 6 and 9)
In these assignments, defendant asserts the state failed to prove that he had possessed the specific intent to kill or to inflict great bodily harm upon the victim. Thus, he claims, the jury erred when it found him guilty of first degree murder pursuant to La.Rev.Stat. 14:30.
In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under that standard, the appellate court must determine whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. State v. Captville, 448 So.2d 676, 678 (La.1984). Under La.Rev.Stat. 14:30, the state was required to prove that defendant had killed Mr. Traylor with the specific intent to kill or to inflict great bodily harm while engaged in the perpetration or attempted perpetration of an aggravated kidnapping or an armed robbery. Specific intent to kill or to inflict great bodily harm may be inferred from the circumstances surrounding the offense and the conduct of the defendant. See La.Rev.Stat. 14:10(1); State v. Butler, 322 So.2d 189 (La.1975).
Defendant argues the gun went off accidentally when Mr. Traylor was attempting to escape from the vehicle after being held hostage. In his confession, he described the events that led to Mr. Traylor's death as follows:
... And we were riding down, we were riding and we headed on out, doing about 65. And then I was driving like this here, and the next thing you know, [Mr. Traylor] come over the seat, and grabbed the gun and did the steering wheel like that. And I said, "Don't let him get the gun, let him get the gun!" And he started, we started struggling well I had this (inaudible) and then when he turned this way, we were headed toward the bayou. The car was leaning, I almost turned over. I said, "Damn!" and we tried to get the gun from him and it just Boom-boom, the gun went off. I said, "Damn man, look at this shit, you fucked up. I told you to watch the damn man." He had took his eyes off the man (inaudible) that's why he tried that. But if he would have kept his eyes on me, he wouldn't have, you know, that wouldn't have even happened. Then, we turned off in the bayou, the tire went on flat, the right tire went on flat. Then I said damn we ain't going to make it and I pulled on side of a garbage can. I wiped my fingerprints and stuff off and then we had got out of the car.
The state's evidence showed that two armed men, defendant and Lewis, kidnapped *791 Mr. Traylor from his driveway, intending to rob him, because they believed he carried on his person cash from his liquor store. Mr. Traylor, unarmed and gagged, was shot twice, once in the leg and once in the chest. Evidence discovered at Mr. Traylor's residence showed that Mr. Traylor was ambushed and injured in his driveway upon his return home from his place of business, as defendant admitted in his statement. Blood was found on Mr. Traylor's black Ford truck located in his driveway. Also found in the carport were pieces of duct tape similar to that used to cover Mr. Traylor's mouth. After he was placed in the back seat of the car and taken away, Mr. Traylor, according to defendant's statement, reached for the steering wheel and defendant's gun. Damage to the vehicle's tire and wheel rim and the vehicle's tire tracks indicated that the vehicle had veered sharply off the highway before it ended up at the landfill site. Although defendant admitted to wiping his fingerprints from the vehicle, the police found two of defendant's fingerprints on a plastic bag located in the glove compartment of Mr. Traylor's car. In addition, four of Lewis's prints were lifted from the exterior of the vehicle's right rear door. The state and defense stipulated that the two bullets that struck Mr. Traylor were fired from a distance of between one and four feet from his body. The bullet that entered Mr. Traylor's chest exited through his back and was found beneath his body; the other bullet was removed from his leg. The murder weapon was never found.
Given this evidence, jurors did not act irrationally in rejecting defendant's explanation that Mr. Traylor's death resulted from an accidental shooting. The jury was free to make determinations as to defendant's credibility and the weight to be attributed to his confession. After reviewing the evidence in the record, we do not find unreasonable either the jury's finding that defendant had shot Mr. Traylor or that he had possessed the requisite specific intent in doing so.
Even if it was Lewis who fired the weapon, that fact would not preclude the jury from convicting defendant of first degree murder. A person may be convicted of intentional murder as a principal to the offense, even if he has not personally struck the fatal blows. See La.Rev.Stat. 14:24.[16] A defendant, however, may be convicted as a principal only for those crimes for which he had the requisite mental state. State v. Brooks, 505 So.2d 714, 717 (La.1987). Those persons who knowingly participate in the planning or execution of a crime may be said to be "concerned" in its commission, thus making them liable as principals. State v. Knowles, 392 So.2d 651 (La.1980).
Under similar facts, this Court has found that an accomplice to a triggerman acted as an equal partner in the murder committed by the two during a crime spree. In State v. Wingo, 457 So.2d 1159, 1164 (La.1984), we reviewed the defendant's role in the killings and the proof of his specific intent. Id. at 1164. We reasoned as follows:
a rational juror, viewing the overall evidence in the light most favorable to the prosecution, could have concluded beyond a reasonable doubt that defendant actively participated in the killing of the victims (whose deaths were obviously purposefully inflicted). Given the evidence presented, it was certainly reasonable for the jury to conclude that defendant's role was that of an equal partner in all of the crimes committed by the two during this episode, including the murders. The theory that Glass (who was significantly smaller than both defendant and Mr. Brown) broke in alone *792 and overpowered the Browns while defendant waited outside, unaware that Glass would kill the helpless victims, is simply not a compelling hypothesis, and the jury acted reasonably in rejecting it.
Id., 457 So.2d at 1165 (citations omitted).
In State v. Brooks, 505 So.2d 714, 717-18 (La.1987), we found that, although the defendant may not have fired the fatal shot, the evidence of his presence and assistance up to the point of the shooting provided a basis from which jurors could have concluded that he actively acquiesced in this use of deadly force. We thus found that the defendant had shared his accomplice's specific intent to kill.
In this case, defendant's confession demonstrates, at the very least, considerable involvement in the abduction and attempted robbery. In light of defendant's admission to giving instructions to his accomplices during the kidnapping, the state's characterization of defendant as the ringleader of the group was neither inaccurate nor implausible. The jurors did not irrationally reject the defense theory that defendant did not acquiesce in the use of deadly force. We conclude that the jury, viewing all of the evidence in a light favorable to the prosecution, could have found beyond a reasonable doubt that defendant had possessed the specific intent to kill or to inflict great bodily harm upon Mr. Traylor.
As a result, defendant's claim that the state presented constitutionally insufficient evidence of intent lacks merit.

Decree
For the reasons assigned herein, defendant's conviction is affirmed. However, defendant's sentence to death is reversed, and the case is remanded for a new trial of the penalty phase.
CONVICTION AFFIRMED; DEATH SENTENCE REVERSED; REMANDED TO DISTRICT COURT.
KNOLL, J., concurs in part, dissents in part, and assigns reasons.
TRAYLOR, J., dissents for reasons assigned by KNOLL, J.
LEMMON, J., dissents in part and assigns reasons.
KNOLL, Justice, concurring in part, dissenting in part.
I concur with the majority that all of the defendant's claims of error during the guilt phase of his trial lack merit and that his conviction for first-degree murder should be affirmed. However, I disagree with the majority's reversal of defendant's death sentence on grounds that his voluntary confession of an unadjudicated and unrelated crime in Houston, Texas was not clear and convincing, and competent and reliable.
This Court has consistently held that the State may introduce evidence of unrelated and unadjudicated criminal conduct in the penalty phase of a first-degree murder trial. See, e.g., State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810, 819-21. The only limitations imposed under our jurisprudence are that: (1) the evidence must be clear and convincing; (2) the evidence must be competent and reliable; (3) the unrelated conduct must have relevance and substantial probative value to prove the defendant's character and propensities; and (4) the evidence must involve violence against the person of the victim of which the period of limitation for instituting prosecution has not run. Id.; State v. Jackson, 608 So.2d 949, 955 (La.1992); State v. Brooks, 541 So.2d 801, 814 (La.1989). What our jurisprudence has not established, absent today's ruling, is that each material element of an unadjudicated and unrelated crime need be corroborated by facts independent of the confession. I cannot agree in the majority heightening the burden imposed upon the State and requiring a more stringent showing by the State. More compelling to me is the fact that the United States Supreme Court has declined to establish such a stringent requirement under the federal Constitution. *793 See, e.g., Miranda v. California, 486 U.S. 1038, 108 S.Ct. 2026, 100 L.Ed.2d 613 (1988) (Marshall & Brennan, JJ., dissenting).
The majority reasons that evidence of defendant's connection with the Houston homicide was not clear and convincing and that the "state has not demonstrated that defendant's statement describing his participation in the Houston incident was reliable and trustworthy." In making this determination, the majority concludes that the State failed to offer any extrinsic evidence that the Houston shooting actually occurred, that defendant's actions resulted in the victim's death, that Big Riley was killed, or that defendant was present at the scene of the alleged murder. As such, the majority reasons that they "cannot say that defendant's admission to the unadjudicated crime was neither the result of braggadocio nor, as his sister suggested in her testimony, an attempt to protect a sibling."
By focusing on these facts, the majority mistakenly focuses on facts necessary to establish the corpus delicti of a charged crime. The facts listed by the majority are all relevant to the determination of whether the evidence is sufficient to find guilt of a crime beyond all reasonable doubt. However, in this case, defendant has already been found guilty of the charged crime, and the jury's focus in the penalty phase, where the State introduced evidence of the unadjudicated and unrelated crime, is focused on what penalty should be imposed. The mere fact that defendant's confession, which the majority concedes was freely and voluntarily given, was allegedly uncorroborated does not mean it was unreliable and untrustworthy. Indeed, nothing in the record suggests that defendant's confession is plainly unreliable and untrustworthy.
Moreover, the majority errs by concluding that the record lacks such corroborative evidence. Although the State, in response to defendant's motion to quash aggravating circumstances, introduced and made part of the record a copy of an outstanding warrant from Harris County, Texas, charging defendant for the murder of the individual named Riley, (R. 261), in preparing and lodging the record with this Court the warrant has mistakenly been omitted. The State provided the defense and the trial court copies of this warrant. (R. 261). Nonetheless, this omission could be easily corrected under LA.CODE CRIM. P. art. 914.1(D)[1] and would save precious judicial time and expense of a new penalty phase trial.
Further, as in State v. Hamilton, 92-1919 (La.9/5/96), 681 So.2d 1217, defense counsel corroborated defendant's confession. Although the majority contends that the confession in Hamilton was reliable and clear and convincing evidence because defense counsel conceded to the crime in closing arguments, the law of this State has long been that arguments and statements made by counsel and the trial court in closing argument are not considered evidence. Notwithstanding, similar to the concession in Hamilton, during the penalty phase of the present trial, defense counsel stated that a shootout in Texas had taken place and that someone got hit by a bullet. (R. 782). In opening statements during the penalty phase of the present trial, defense counsel stated that defendant had confessed on the tape that there had been a shooting in Texas, a lot of people had guns, Big Riley got shot, and that defendant fled Houston because police were trying to question him about Big Riley. (R. 788). Thus, just as in Hamilton, here defense counsel conceded many of the facts that the majority asserts the State failed to corroborate. Given the holding in Hamilton, I can find no meaningful distinction between the facts and *794 circumstances of that case and the case sub judice.
Secondly, taking defendant's confession as a whole and not just that portion of his confession to the Houston crime, there was sufficient corroboration to determine that the confession was reliable. In this case, the defendant in a single confession confessed to the charged murder and to the Houston murder. The State presented to the jury sufficient evidence to prove beyond all reasonable doubt that defendant committed the charged crime. Thus, contrary to the majority's assertion, by providing the jury with sufficient evidence to find defendant guilty of the charged offense the State has provided sufficient proof that the defendant's entire confession provided clear and convincing and competent and reliable evidence of the unadjudicated and unrelated crime.
Of significant concern is the majority's conclusion that the defendant's admission to the unadjudicated crime was possibly an attempt to protect a sibling. The defendant's sister testified at the penalty phase of the trial for her brother. In response to the questions, "What about the other children, are they all alive? You said you had six ... or seven?", defendant's sister, obviously unresponsive to the questions asked, answered with the following self-serving testimony:
Um ....[defendant] covered for his little brother when he admitted to that....that robbery, or ....wanted in Houston. His little brother deceased now. Why he carrying on the lie, he don't have to. William committed it. He got killed last year. [Defendant] didn't have nothing to do with that. I don't know why he carrying it on and saying he did.
The jury heard this testimony and was obviously not convinced or impressed. I cannot agree that her testimony places a veil of serious concern over defendant's voluntary confession or raises a warning flag that defendant was possibly confessing to protect the guilt of a deceased brother.
Finally, this case does not present the same fear of braggadocio or exaggeration by the defendant that we faced in State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366. In Brooks, the defendant confessed to four murders for which he had been convicted, two murders for which he was being prosecuted, two murders for which he was under indictment, and twenty-seven other unadjudicated offenses. In the guilt phase of the trial, the State offered no evidence to corroborate the fact that twenty-three of the unadjudicated offenses had even taken place. We held that the State had failed to demonstrate any guarantees of trustworthiness of the defendant's confession given (1) the inability of the police to verify even the occurrence of many of the purported offenses; (2) the relative likelihood that the defendant voluntarily inflated the scope of his crime spree during the confession given that he knew retribution was nigh; and (3) the fact that the police knew defendant had been under psychiatric care because of his mental retardation and erratic and unpredictable behavior and therefore should have raised a warning flag. Brooks, 648 So.2d at 376-77. Here, we are not presented with such circumstances. First, defendant's confession extensively detailed his role in two crimes, the murder for which he was found guilty and the Houston murder, not some thirty-five crimes as in Brooks. Thus, I cannot say with any reason that defendant is voluntarily inflating the scope of his actions. Second, there was no evidence that the State knew defendant suffered a psychiatric deficiency that would have raised a warning flag as to the veracity of his confession. Unlike Brooks, this is simply not a case where the risk of fabrication or inaccuracy of the defendant's voluntary confession required, as a predicate to the admission of that confession, corroboration of the unadjudicated crime.
*795 In my view, before the imposition of such a burden on the State, the record must suggest the need for a more stringent requirement for the introduction of a voluntary confession of an unadjudicated and unrelated crime. There is no evidence in the record before us to support this stringent requirement. For these reasons, I respectfully dissent from the reversal of the penalty phase of defendant's trial and would affirm the imposition of his death sentence.
LEMMON, J., dissenting.
Defendant, in a single statement that was clearly voluntary, confessed to two separate and distinct crimes: (1) the Louisiana murder of Steven Traylor, which is the subject of the conviction of first degree murder and sentence of death now under review, and (2) the murder or attempted murder in Texas of a person known as "Big Riley." The confessed facts that Traylor was murdered in Louisiana and that defendant committed that murder were substantially corroborated by independent evidence at the trial in the present case. Therefore, defendant's confession was proved to be clearly reliable and trustworthy in regard to the murder of Traylor. The issue on which the majority reverses defendant's death sentence is whether defendant's trustworthy confession needs to be corroborated as to the details of the murder or attempted murder of Riley in Texas.
The jurisprudential rule requiring corroboration of confessions is not constitutionally required. The primary purpose of the rule is to test the reliability of a confession and thereby prevent an erroneous conviction based solely on an untrue confession. Warszower v. United States, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941); State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190. The key words in this statement of purpose are "conviction" and "solely."
The jurisprudential requirement of independent proof of the corpus delecti is a requirement of sufficiency of the evidence for a conviction. 1 McCormick, Evidence § 145 (John M. Strong ed., 4th ed.1992). Because a confession to an unreported and unverifiable crime is inherently suspicious, the requirement of independent proof of the corpus delecti rejects a conviction of the crime based solely on the confession, in the absence of some corroboration.
The corroboration requirement has generally been criticized as no longer necessary, since there are modern day safeguards in the taking of confessions that protect against, for example, a mentally unstable person's confessing to and being convicted of a crime that never occurred. McCormick, supra; see also 7 Wigmore, Evidence § 2070 (Chadbourn rev.1978). Nevertheless, whatever the merits of continuing the corroboration requirement in determining the sufficiency of evidence for a conviction, this court should decline to extend such a requirement to a situation not involving a conviction of the confessed crime.
In State v. Martin, supra, this court upheld a first degree murder conviction based on a killing during the perpetration of an aggravated rape when the defendant had confessed to both murder and rape, but the confession was the sole evidence of the commission of the aggravated rape that constituted the aggravating circumstance necessary for the first degree murder conviction. This court held that the independent corroborating evidence regarding defendant's commission of the murder established the reliability of his single statement that gave details of both the charged crime of first degree murder and the underlying aggravating circumstance (the rape). This court stated that "[t]he rule should not be extended to add a requirement that independent evidence corroborate every element of the crime admitted in the accused's statement, the general reliability of which has been corroborated." 93-0285, p. 8, 645 So.2d at 195.
*796 In the present case, as in Martin, the main concern is the reliability of the confession, the overall reliability of which has been corroborated. Moreover, as in Martin, the confession is not being used to convict the defendant of the crime which is not independently corroborated. I decline to extend the corroboration requirement to the murder or attempted murder of Riley, which was offered as evidence of defendant's character and propensities, and was not the charged crime of which defendant was convicted. Defendant's participation in the Riley crime was, under these circumstances, sufficiently proved by his overall reliable and trustworthy confession.
NOTES
[*] Victory, J., not on panel. See Rule IV, Part 2, § 3.
[1] Assignments of error not argued or involving only settled principles of law are treated in an unpublished appendix, which is attached to this opinion and is part of the official record in the case.
[2] The defendant in Hamilton based this argument on State v. Bourque, 622 So.2d 198 (La.1993), which has since been overruled by State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16.
[3] In addition, defendant argues that the coercive circumstances and his incompetency, as evidenced by his psychosis, hallucinations, and low intelligence quotient (IQ), contribute to the unreliability of his statement. However, there have yet been no judicial determinations that defendant was not competent or that he suffered from either a mental illness or low intelligence. The psychiatric evidence referenced by defendant was contained in an affidavit attached to his appellate brief.
[4] The district court relied on Comeaux at the motion for new trial. Although Comeaux does repeat the standard of proof for the admission of unadjudicated other crimes evidence in the penalty phase, as articulated in Brooks I and Jackson, the other crimes evidence in that case did not alone consist of an uncorroborated admission by the defendant. There, we were faced with the issue of whether the sheer volume of the other crimes evidence had injected an arbitrary factor into the sentencing proceeding. 93-2729, p. 12, 699 So.2d at 23. We concluded the quantity of the evidence did not impermissibly shift the jury's focus from its primary function of determining the appropriate sentence for the offense and the offender.
[5] The trial court here expressed doubt as to the clear and convincing nature of the confession alone, but it believed that our decision in Hamilton was controlling.
[6] In United States v. Sherrills, 929 F.2d 393, 395 (8th Cir.1991), the court acknowledged that the trial court's observations are extremely critical in judging inattentiveness, which involves "subjective judgments that are particularly susceptible to the kind of abuse prohibited by Batson [,and] requires observations of demeanor that will often not be reflected by the written record. This difficulty is compounded by the need to compare the attentiveness of the challenged venire members with those who were not challenged."
[7] The court in United States v. Bentley-Smith, 2 F.3d at 1375, stated:

The reason certainly is stronger if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions re-peated... [but] the judge is free, based upon all the information presented and that judge's eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race.
[8] At any rate, defense counsel did not object to the trial court's query about Sykes's association with a convicted felon. Defendant cannot now raise on appeal as error the trial court's action. La.Code Crim. Proc. art. 841.
[9] As we stated in Green, 94-0887, pp. 28-29, 655 So.2d at 290 (footnote omitted):

The fact that a defendant has met his initial burden of making a prima facie showing of purposeful discrimination does not mean that the defendant's arguments and evidence are sufficient to carry his ultimate burden of persuading the trial judge of the existence of such discriminatory intent; rather, a defendant's prima facie showing only raises a "necessary inference of purposeful discrimination," an inference which the trial judge is free to accept or reject based upon the credibility of the State's proffered reasons and how those reasons play against the facts and circumstances surrounding the voir dire. Batson, supra, 476 U.S. at 95, 106 S.Ct. at 1722.
[10] "There is no Brady violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source, because in such cases there is really nothing for the government to disclose." Coe v. Bell, 161 F.3d at 344 (citations and internal quotations omitted).
[11] The letter reads:

Richard Hobley, whose sentencing comes up on December 19th, has attended Natchitoches Mental Health Clinic since November 1995.
I am writing simply as a citizen to beg the courts (sic) sympathy with his problems and limitations.
[12] The district court was correct that it had no discretion under Louisiana law other than to sentence defendant to death. La.Code Crim. Proc. art. 905.8.
[13] Trammel explained that defendant had been transported from Shreveport to the Red River Parish jail because the Natchitoches jail was out of space.
[14] The following exchange took place between defendant and his attorney at the hearing.

Q: Okay. You were in a little room in Red River Parish, is that what you're telling me?
A: Uh-huh. Little one man cell.
Q: By yourself?
A: Yes, sir.
Q: Okay. But then you on your own contacted the jailer, is that right?
A: Yes, sir.
Q: Okay. And what did you tell the jailer?
A: I told the jailer I wanted to talk to those two detectives that dropped me off.
Q: Okay. Well then what happened after that?
A: Then he told me ... he said okay. Then he's telling about he knew Ricky Ray Lewis and them and stuff, you know. And then after he say he knew them and stuff, we were talking and stuff. Then he say he knew Otis Anthony. And that's how we got to ... I starting talking to him about it. I say, "Yeah."
[15] The psychiatric evidence to which defendant refers was contained in an affidavit attached to his appeal brief and included in his motion to supplement the record.
[16] La.Rev.Stat. 14:24 provides:

All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
[1] LA.CODE CRIM. P. art. 914.1(D) provides:

The trial court or the appellate court may designate additional portions of the transcript of the proceedings which it feels are necessary for full and fair review of the assignment of errors.