831 So.2d 341 (2002)
STATE of Louisiana
v.
Jerrick PUGH.
No. 02-KA-171.
Court of Appeal of Louisiana, Fifth Circuit.
October 16, 2002.
*343 Jane L. Beebe, Gretna, LA, for Appellant, Jerrick Pugh.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison WallisCounsel of Record on Appeal, Assistant District Attorneys, Gretna, LA, for Appellee, State of Louisiana.
Panel composed of Judges JAMES L. CANNELLA, CLARENCE E. McMANUS and HENRY G. SULLIVAN, JR., Pro Tempore.
JAMES L. CANNELLA, Judge.
Defendant, Jerrick Pugh, appeals from his conviction of second degree murder and his sentence to life in prison without benefit of parole, probation or suspension of sentence. For the reasons that follow, we affirm the conviction and sentence.
On November 13, 1997, a Jefferson Parish Grand Jury returned a bill of indictment charging the Defendant with first degree murder. The Defendant pled not guilty at arraignment. After the Defendant filed a motion to appoint a sanity commission, a hearing was held and the trial judge found the Defendant to be incompetent to stand trial. After a second sanity hearing, the trial judge found that the Defendant had improved and was competent. The Defendant filed two additional motions to appoint a sanity commissions, hearings were held, and he was found to be competent. The trial judge also denied the Defendant's motion to suppress his statement. Thereafter, the State amended the bill of indictment to charge the Defendant with second degree murder.
A jury trial commenced on March 21, 2001 and the following evidence came forth. In the early morning hours of September 13, 1997, Deputy Dana Parker of the Jefferson Parish Sheriff's Office (JPSO) responded to a call of a shooting in the 300 block of Ruby Street, which is near the Oakwood Mall on the Westbank of Jefferson Parish.[1] Deputy Parker found the victim, Ronald Bourgeois, lying in the parking lot of an apartment complex at 321 Ruby Street. According to Deputy Parker, the victim had an apparent gunshot wound to the head, was alive, but was unresponsive. George Simmons, Sr. (Simmons, Sr.), who was near the victim when Deputy Parker arrived, gave Deputy Parker a description of a van that had left the scene after the shooting. The deputy notified headquarters and requested emergency medical assistance.
At approximately 6:35 a.m., Sergeant Kevin Bussard of the JPSO was on the way to his office in the Oakwood Mall *344 when he heard the broadcast of the shooting on the police radio. As he was passing 638 Nel Place, approximately two blocks from the crime scene, Sergeant Bussard saw a parked gray van. When he stopped to investigate, Sergeant Bussard observed that no one was in the van and the windows were half open on both sides. Sergeant Bussard observed a .22 caliber cartridge and a key sitting on an upside down bucket between the seats. Sergeant Bussard called a deputy to stay with the van and he went to the crime scene.
When Sergeant Bussard reached Ruby Street, he learned that there was a witness, George Simmons, Jr. (Simmons, Jr.),[2] who saw a van leave the scene. Sergeant Bussard brought Simmons, Jr. to Nel Place, and Simmons, Jr. positively identified the van as the one he saw leaving the crime scene. After canvassing the area that night, Sergeant Bussard discovered the van was used by Brence and Eugene Burden, who denied ownership of the bullet in the vehicle.
The first suspect in the shooting was Kemo Charles (Charles). Detective Michael Tucker of the JPSO testified that the investigation initially focused on Charles after interviews with the Burdens, Simmons, Sr. and Simmons, Jr. The Burdens identified Charles as the person who had rented the van from them that night, and both Simmons stated that Charles was the person who had shot the victim. According to Detective Tucker, Charles was arrested and made two statements, but he did not confess to the shooting. Simmons, Jr. subsequently told Detective Tucker that the Defendant was the person who had shot the victim. Detective Tucker stated that Simmons, Jr. told him that he had initially misled the police because he was afraid of the Defendant.
The Defendant was arrested and, on September 18, 1997, he gave two tape-recorded statements to Detective Ralph Sacks of the JPSO. The tapes and transcripts of the statements were admitted into evidence and the tapes were played for the jury. In the first statement, the Defendant said that he had been at his girlfriend's apartment at approximately 2:00 or 3:00 a.m. before going to Ruby Street. A friend, Robert, also known as "Chop", arrived at the Defendant's girlfriend's apartment where the Defendant was using cocaine. Robert joined the Defendant in "getting loaded." Robert and the Defendant met Danny, one of Robert's friends, at the complex, then later Charles. The Defendant claimed that the shooting happened when, "all of a sudden a white man come from around the corner, he just shot all over there." The Defendant said that the white man was walking through the apartments near Ruby Street before the shooting. When Detective Sacks asked who had shot toward the victim, the Defendant replied, "Robert, Kemo, and... Danny." The Defendant said that he was standing near the Simmons' apartment immediately before the shooting, and ran inside the apartment after the shooting. After, he and Simmons, Jr. "started snorting" cocaine together. Simmons, Jr. provided some clothing for the Defendant and the Defendant's girlfriend arrived at the Simmons' apartment. A few minutes later, the Defendant returned to his girlfriend's apartment. The Defendant said that he told his girlfriend that he was not involved in the shooting. The Defendant denied seeing a gun and borrowing a gray van from anyone that night.
*345 After the statement, Detective Sacks confronted the Defendant with his theory of the case and the Defendant made another statement in which he admitted that the victim was shot while the Defendant was attempting to rob him. The Defendant acknowledged that the beginning of the previous statement was true, but admitted that he, Danny and Robert had obtained the van, which was rented in part for "some powder" provided by the Defendant. After renting the van, the trio went to Ruby Street to meet Charles. Danny was driving the van, the Defendant was in the front seat, and Robert was in the back seat. A few minutes later, they parked the van and the victim walked toward the van and said, "I want something for forty," which the Defendant explained meant that the victim wanted to buy crack cocaine. The Defendant decided that he would "have to rob" the victim, since the Defendant had already spent all of his money on cocaine. The Defendant picked up the gun that was in the van and, as Danny was "about to serve" the cocaine, Defendant said "just give it up ... I want the money." According to the Defendant, the victim grabbed the gun and it "went off." After the shooting, Danny and Robert left in the van, while the Defendant ran to the Simmons' residence where he left the gun and his clothing. The Defendant said that his girlfriend and Charles came over to the Simmons' apartment and that he left with the two of them shortly thereafter. According to the Defendant, Charles did not have anything to do with the shooting and was not even outside when the shooting happened.
Simmons, Sr. did not testify at trial. Simmons, Jr. testified similar to the second statement of Defendant. He said that he had seen the Defendant early that morning with "Chop" and "Black." Simmons, Jr. stated that he and the Defendant snorted some cocaine together that morning before the victim approached. According to Simmons, Jr., the Defendant was armed with a gun and was planning to go to Baton Rouge in the van to "do some robbing." When Simmons, Jr. saw the victim nearing the van, he returned to his apartment across the street. He turned around and saw that "Jerry had the gun on the man, then, the man threw his hands up like, `No'." After the Defendant shot the man in the head, Simmons, Jr. went inside the apartment. Simmons, Jr. testified that it appeared as though the victim grabbed the gun.
Simmons, Jr. testified that Simmons, Sr. yelled for him to return outside, and bring a towel for the victim's head. As Simmons, Jr. brought out the towel, the Defendant ran inside the Simmons' apartment. According to Simmons, Jr., the Defendant said, "Your Daddy going to rat on me. Go outside and find out, make sure they don't know it's me. Tell them anybody besides me." The Defendant and Simmons, Jr. used some more cocaine and then provided the Defendant a change of clothes. The Defendant left his clothes and the gun, which Simmons, Jr. said that he sold in the Fisher housing project for some crack. Simmons, Jr. said that Charles was an "associate," and that he did not know that Charles was in prison for armed robbery. Simmons, Jr. stated that he had initially misled the police because he was afraid of the Defendant. According to Detective Tucker, the police looked for the gun in the Fisher project, but it was never recovered.
A firearms expert, Louise Walzer, testified that State's Exhibit 13, a projectile recovered from the victim's head, was consistent with a .22 caliber bullet. According to Dr. McKenzie, who performed the victim's autopsy, the bullet was probably fired less than twelve inches from the victim's head. Dr. McKenzie stated that the *346 distance could be even less, between six to eight inches, if a .22 caliber gun had been used.
On March 28, 2001, ten members of the twelve person jury found the Defendant guilty of second degree murder. On May 3, 2001, the trial judge denied the Defendant's motion for a new trial and, after the Defendant waived delays, sentenced the Defendant to life imprisonment without benefit of probation, parole or suspension of sentence. The trial judge denied the Defendant's motion to reconsider the sentence and granted the timely motion for appeal. On appeal, the Defendant assigns three errors.

ASSIGNMENT OF ERROR NUMBER ONE
In this assignment of error, the Defendant argues that the trial judge erred by not holding a fourth sanity hearing and by finding him competent to stand trial. The State responds that the Defendant failed to meet his burden of proving that he was incompetent.
After the Defendant's initial motion for a sanity commission, he was examined by Doctors Ellen Gandle and Alan Newman. The report of these physicians indicates that he was 21 years old at the time of the evaluation in February of 1998 and that he had graduated from high school. At the April 9, 1998 sanity commission hearing held before Judge Marion Edwards, Dr. Gandle testified that the Defendant's intelligence quotient (I.Q.) was 65, placing him in the "mild mentally deficient range" of intelligence. Dr. Gandle opined that Defendant was not able to understand the proceedings against him or assist his attorney due to this "cognitive limitation," which caused him to be "more easily confused" about the issues relating to trial. For example, Dr. Gandle stated that the Defendant "demonstrated some difficulty" with the notion that the prosecutor was not working with him. Specifically, Dr. Gandle said that the Defendant was "fairly suggestible" and she was concerned that the Defendant might answer questions at trial in order to please the questioner, rather than to tell the truth. Dr. Gandle stated that the Defendant was educable and believed that he would be able to assist his attorney and understand the trial process after jail-based education. Finally, Dr. Gandle stated that, to her knowledge, the Defendant had never been hospitalized nor received medication for psychiatric reasons.
After the hearing, Judge Edwards found that the Defendant was incompetent to stand trial and ordered that he receive jail-based education as recommended by Dr. Gandle.
The Defendant received jail-based education from Barbara Johnson (Johnson), a social worker and the district forensic coordinator for the Department of Health and Hospitals under the Feliciana Forensic Facility Program. The Defendant was again evaluated by Doctors Gandle and Newman on May 27, 1998. The trial court held another sanity hearing on July 9, 1998, at which Dr. Gandle and Johnson testified. According to Johnson, she had worked with the Defendant while he was in jail pursuant to the trial court's order. Dr. Gandle testified that the Defendant was able to understand the proceedings and assist in his defense due to the jail-based education that he had received.
Dr. Gandle affirmed that the Defendant understood the roles of participants in the trial process, that he was not on medication and did not relate any symptoms of psychotic behavior during the evaluation. Although the Defendant still tested in the mildly mentally retarded range, Dr. Gandle stated that people within this range are often educable. Dr. Gandle acknowledged that the Defendant reported that he had *347 seen a psychiatrist when he was 14 years old, but stated that he did not know why. Dr. Gandle opined that this was probably related to the Social Security Income (SSI) disability benefits and not because of any psychiatric problems requiring medication. After the hearing, Judge Edwards ruled that the Defendant was competent to stand trial.
In February of 1999, the defense filed another motion to appoint a sanity commission. Doctors Debra DePrato and Jill Jura evaluated the Defendant on February 24, 1999 and a sanity hearing was held on April 8, 1999 before Judge Patrick Hand. Dr. DePrato, an expert forensic psychiatrist, concurred with the Defendant's diagnosis of mild mental retardation, but Dr. DePrato found that he was able to assist in his defense and to understand the proceedings against him. Finally, Dr. DePrato testified that, although the Defendant's mental diagnosis had not changed, his "level of functioning" had improved. After the hearing, the trial judge ruled that the Defendant was competent to stand trial.
On October 11, 2000, the Defendant filed another motion for a sanity hearing because his ability to assist his attorney had "dramatically declined" because of the pressures of jail and the threat of the death penalty. A few days later, Doctors Craig Troxclair and Steven Ross attempted to evaluate the Defendant. At the next sanity hearing held before Judge Ross La-Dart on December 7, 2000, Dr. Troxclair, an expert forensic psychiatrist, testified that the Defendant refused to cooperate with the evaluation. According to Dr. Troxclair, the Defendant stated that he was "not talking to anyone" and that he did not "need these people to tell me I'm competent to stand trial." As a result, Dr. Troxclair stated that he could not render an opinion on the Defendant's competence.
The defense called Dr. Sara DeLand, an expert forensic psychiatrist, who acknowledged that she was not appointed by the court to serve on any of the sanity commissions. Dr. DeLand stated that she had met with the Defendant, but that the Defendant refused to cooperate and said that the "Lord was going to take care of it all so he didn't need to speak to me or his attorneys any more." When Dr. DeLand attempted to meet with the Defendant another time, he refused. Dr. DeLand reached the same conclusion as Dr. Troxclair, that the Defendant needed further evaluation to determine whether he had an illness or was malingering. According to Dr. DeLand, due to the waiting list, it would have taken nearly a year for the Defendant to get into the Feliciana mental hospital for evaluation.
Thereafter, the trial court ruled that the Defendant failed to meet his burden of proving that he was incompetent. The trial judge further commented that the March of 1999 report indicated that the Defendant was competent and that he had heard nothing to indicate otherwise. Defense counsel objected and entered into the record a document, which was sealed by the trial court. This document contains defense counsel's assertions that he did not believe that the Defendant was competent to stand trial based on his own personal observations.
Prior to trial, the defense filed a Motion to Proceed Ex Parte on the basis that Ken Dohre (Dohre) believed that the Defendant was unable to assist counsel and feared that an open hearing would reveal privileged information. The trial court granted the motion and set the hearing for March 26, 2001, the first day of trial. The State objected to the ex parte hearing, and further pointed out that the Defendant did not file a motion requesting that the trial court appoint a sanity commission. Nevertheless, *348 the trial court held an ex parte hearing, at which the defense counsel waived the Defendant's presence.
At this hearing, Dohre stated that the Defendant had been unable to assist in his defense, due to "some mental defect." Dohre testified that the Defendant was "unable to meaningfully answer questions or meet with the Investigator or be evaluated by Experts." He further stated that the Defendant told him that preparing for trial is unnecessary because God had sent a vision to him "letting him know that he is going to walk and be free." Dohre testified that these visions exceeded "normal religious devotion"
Dohre further opined that the Defendant was incapable of making a voluntary decision regarding testifying at trial because of his diminished condition:
By Dohre:
I have explained to Mr. Pugh the pitfalls of testifying in his own defense at this Trial. And while Mr. Pugh originally seemed to understand the fact that his drug conviction would be used, would come out as impeaching evidence, it would be very damaging to the Defense; he now informs me that he's not going to listen to what I have to say. Mr. Pugh informs me that he knows that he was not talking to me about the pitfalls but he said he wasthat I wasthat the Devil was talking through me. Mr. Pugh said that he is not going to listen to what I had to say, and rebuke the Devil.
He has maintained, Mr. Pugh has maintained that his testimony would be consistent with is [sic] first statement that was given to the police, and which this Court has ruled admissible.
And I have explained to him that the State would in all likelihood play that testimony; and therefore he wouldn't have to testify to give his story out, his version of events out, because his actual words would be played on tape and the Jury could read along on the transcription of those tapes.
However, he then stated that he did not know what to say; but because God would tell him what to say when he took the stand. Mr. Pugh apparently plans to use the witness stand to preach to the Jury.
Dohre further stated that the Defendant had previously concurred with his recommendation against testifying. But, the day before, the Defendant had changed his position and wanted to "testify and preach to the jury." According to Dohre, this was not the decision that a competent person would make.[3]
Thereafter, the following discussion took place:
THE COURT:
You asked for an Ex Parte Hearing, at least with me, to make a record of it, to state your case as it were.
MR. DOHRE:
Yes, Your Honor.
THE COURT:
Based on what you've told me, and given the fact that he has in the past been found competent the last time; and secondly, that he refuses to participate with a Sanity Commission, as was asked before the last time; given the fact that one has not been filed for, and given the fact that I truly understand your concern; however, I don't think I hear enough to warrant me stopping this Trial, *349 and wait and see if you want a Competency Hearing on your client. I'm not going to do it.
MR. DOHRE:
I understand, Your Honor.
THE COURT:
And it may well be that sometime later in the Trial, when it's time for him to either take the witness stand or not take the witness stand, you may wish to reurge these very things; I don't know. But for now, as far as I'm concerned, I think the man is ready to go to Trial.
MR. DOHRE:
Okay. Your Honor, and I just want to make it clear; I'm asking for a competency evaluation. And I know it's the Court's position that, at least at this time none will bethere will be none.
THE COURT:
None, absolutely none.
MR. DOHRE:
I understand, Your Honor.
THE COURT:
I have absolutely no assurance that he would even participate in one, alright. And that in and of itself may be symptomatic of something; but it may just be symptomatic of being tactical. I don't know the answer to that. Lets [sic] pick a jury.
The Defendant's argument on appeal is that the trial court erred in not appointing another sanity commission to evaluate him and in finding that he was competent to proceed to trial in view of the information presented in the ex parte hearing.
A defendant's mental incapacity to proceed may be raised by the defense, the district attorney, or the court at any time. La.C.Cr.P. art. 642; State v. Clark, 367 So.2d 311, 313 (La.1979); State v. Payne, 586 So.2d 652, 654 (La.App. 5th Cir.1991). The trial court is required to order a mental examination of the defendant only when it has a reasonable ground to doubt the defendant's mental capacity to proceed. La.C.Cr.P. art. 643; State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, 786, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000); State v. Bibb, 626 So.2d 913 (La.App. 5th Cir.1993), writ denied. 93-3127 (La.9/16/94), 642 So.2d 188. Moreover, there must be substantial doubt as to mental capacity before refusal to order an examination constitutes an abuse of the trial court's discretion. State v. Hobley, supra.
The Louisiana Supreme Court stated in State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 846 that
[t]he question of whether the defendant was deprived of his due process right to a determination of his competency contemporaneous to trial turns on whether the trial judge received information that, if objectively considered, should reasonably have raised a doubt about defendant's competency and alerted the judge to the possibility that the defendant could neither understand the proceedings nor appreciate their significance, nor rationally aid his attorney in his defense.
La.C.Cr.P. art. 641 provides that "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense."
The two-fold test of capacity to stand trial is whether a defendant understands the consequences of the proceedings and has the ability to assist in his defense by consultation with counsel. Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); State v. Bennett, 345 So.2d 1129, 1138 (La.1977). In State v. Bennett, supra, the Louisiana Supreme *350 Court listed the factors to be used in determining competency to proceed:
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
The law, however, presumes a defendant's sanity. La. R.S. 15:432; State v. Bibb, 626 So.2d at 927. Although the trial judge may receive the aid of expert medical testimony on the issue of competency to proceed, the ultimate decision of capacity rests with the trial court. State v. Bridgewater, 00-1529, p. 13 (La.1/15/02), 823 So.2d 877, on reh'g, 00-1529 (6/21/02).[4] Further, the trial court's ruling on a defendant's mental capacity to proceed is entitled to great weight on appellate review and will not be reversed absent an abuse of discretion. State v. Bibb, 626 So.2d at 928.
In State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982), the Louisiana Supreme Court affirmed a trial judge's finding of competency even though the defendant refused to cooperate with the evaluation. In that case, the Edwards court noted that "the trial judge's ruling was a difficult one primarily because of defendant's failure (the trial judge found it a refusal) to cooperate with the two examining physicians who made up the appointed Sanity Commission." State v. Edwards, 406 So.2d at 1341. The Supreme Court observed that, while the defendant's "general lack of cooperation and his unresponsive and flippant answers" caused the doctors to opine that he should be observed for a longer period of time to determine his mental status, neither of the doctors expressed the opinion that the defendant was incapable of standing trial. Id. at 1342.
Likewise, in State v. Holmes, 393 So.2d 670 (La.1981), the Supreme Court affirmed the trial judge's finding that the defendant was competent, despite his refusal to cooperate with the evaluation that prevented the doctors from rendering an opinion on his competence. Both of the doctors stated that more time was needed to determine whether the defendant's lack of cooperation was genuine or feigned. *351 The defendant had only a sixth grade education, but nothing in the record indicated that he was mentally retarded, or that he had ever been treated for mental illness. Based on the trial judge's observations of the defendant, he concluded that the defendant was malingering and found him competent to proceed. Id. at 673. The Supreme Court found that the record supported the trial judge's decision and focused on several factors, including the defendant's conduct at trial, which the Supreme Court found "discredited his prior claim of incapacity." Id. at 674.
We find that the present case is similar to Edwards and Holmes. The last physicians who examined the Defendant could render no opinion on the Defendant's competence because of the Defendant's refusal to cooperate. The initial determination that the Defendant was incompetent was based on the Defendant's lack of understanding of his legal rights, not on any particular mental disease. The Defendant's capacity to understand changed after he was educated. The record reflects that the Defendant was literate and had no physical handicap. Although the Defendant did not ultimately testify at trial, the record reflects that the Defendant conversed intelligently with the trial court when he informed the trial court that he wished to testify and waive his right against self-incrimination. The Defendant's low I.Q. does not, alone, mandate a finding of incompetence. State v. Brooks, 541 So.2d 801, 807 (La.1989). Further, it is noted that the Defendant was not a stranger to the trial process. About two years before the Defendant was tried and convicted by a jury of twelve persons for distributing cocaine. State v. Jerrick Pugh, 99-851 (La.App. 5th Cir. 12/21/99), 750 So.2d 313, 314, writ denied, 00-206 (La.8/31/00), 766 So.2d 1273. Defense counsel expressed concerns about the Defendant's competence, but no medical evidence was presented to support the claims.
Under these circumstances, we find that the trial court did not abuse its discretion in denying the Defendant's request for a fourth competency evaluation because reasonable grounds were not presented to show the Defendant's lack of ability to understand the proceedings against him or to assist in his defense. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
In this assignment of error the Defendant argues that his right to present a defense was abridged because the trial judge granted the State's motion in limine to exclude the toxicology report on the victim, which showed the presence of cocaine in the victim's body at the time of death. According to the Defendant, the report would have corroborated his theory that the shooting occurred during a drug transaction and was accidental, as Defendant said in his second statement. The State responded that the report was irrelevant except to impugn the character of the victim and was certainly more prejudicial than probative.
Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. However, this right does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that is substantially outweighed by other legitimate considerations in the administration of justice. State v. Mosby, 595 So.2d 1135, 1138 (La.1992); State v. Carter, 96-358 (La.App. 5th Cir.11/26/96), 685 So.2d 346, 351; La. C.E. art. 403. Relevant evidence is defined in La. C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the *352 determination of the action more probable or less probable than it would be without the evidence." Irrelevant evidence is inadmissible. La. C.E. art. 402.
Under the facts of this case, we find that the toxicology report was irrelevant. According to the Defendant's own statement, he shot the victim, whether by accident or not, while he was attempting to rob him at gunpoint. This evidence supports a conviction for second degree murder, even if the Defendant did not specifically intend to kill the victim.[5] Thus, because the toxicology report would have corroborated the Defendant's second statement, it would not have made it relevant to any legitimate defense theory. All that the report would have demonstrated was that the victim had cocaine in his body at the time of the autopsy, which is not a fact that is of consequence to the determination of the Defendant's guilt. Moreover, there was already evidence in the record that the victim was involved in a drug transaction. In addition, even if relevant, its probative value would be substantially outweighed by the danger of unfair prejudice. La. C.E. art. 403.
Since the toxicology report did not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," we find that the trial judge did not abuse his discretion in excluding the toxicology report. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
In this assignment of error the Defendant argues that the trial judge improperly denied his motion to suppress because his limited mental capacity prevented him from voluntarily waiving his constitutional rights. Thus, the Defendant contends that his ensuing confession was involuntary. The State responds that the record supports the trial judge's determination that the Defendant validly waived his rights and gave a voluntary confession.
Before a confession may be admitted into evidence, the State has the burden of affirmatively showing that it was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. La. R.S. 15:451; State v. Lavalais, 95-0320 (La.11/25/96), 685 So.2d 1048, 1053, cert. denied, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997). In cases involving allegations of diminished mental capacity, a defendant has the burden of proving the existence of any mental abnormality that might render his confession per se involuntary. State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 279.
Further, if the statement was made during custodial interrogation, the state must show that the defendant was advised of and voluntarily waived his constitutional rights, as provided by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which was reaffirmed in Dickerson v. United States, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). The question of whether a defendant's purported waiver of his Miranda rights was voluntary is determined by the totality of the circumstances. State v. Green, 655 So.2d at 280.
The Louisiana Supreme Court has recognized that a diminished intellectual *353 capacity does not, alone, vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. See, State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, 126, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Benoit, 440 So.2d 129, 131 (La.1983). The critical factor is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement. Tart, supra; Benoit, supra.
In State v. Green, supra, a defendant's waiver of his Miranda rights was held valid, even though the defendant had an I.Q. of only 65. In that case, police officers testified that they believed the defendant knowingly waived his Miranda rights, while a psychologist stated that the defendant had been unable to understand his rights when they were read to him because of the defendant's mental incapacity. According to the psychologist, defendant's mental age was ten years old and he suffered from "brain dysfunction." State v. Green, 655 So.2d at 282.
Nevertheless, the Louisiana Supreme Court found that the state had met its burden of showing a valid waiver. The Green court focused on the circumstances surrounding the defendant's interrogation, specifically that the defendant initially attempted to "extricate himself from culpability for the murder, and the evolution of his statements over time, in response to new facts presented Green by the detectives, reveal[ed] a mental agility and adaptability." Id. at 282. The Supreme Court observed that the defendant's criminal history was another factor that indicated that the defendant understood his Miranda rights. Id. at 282.
In an earlier case, State v. Trudell, 350 So.2d 658 (La.1977), the Louisiana Supreme Court had concluded that the state proved that an "easily led and very suggestible" mentally retarded defendant with an I.Q. of 60 voluntarily made inculpatory statements. The defendant had twice been found incompetent to stand trial before ultimately being declared competent. In reaching the conclusion that the statements were voluntary, despite the defendant's mental illness, the Trudell court focused on the officers' testimony, the sanity commission reports indicating that the statements did not show psychosis, and because the individual statements which were made were, as the Trudell court stated, "lucid." Id. at 663.
In this case, the State presented evidence that the Defendant validly waived his Miranda rights through Detective Sacks' testimony. At the suppression hearing, the officer testified that, prior to the first statement, he advised the Defendant of his constitutional rights and that he read the Rights of Arrestee form to the Defendant, which the Defendant signed. According to Detective Sacks, the Defendant said that he understood these rights, wanted to waive his rights, and desired to make a statement. The Defendant told Detective Sacks that he had completed high school and could read and write. The form, which was introduced at the hearing, contains two signature lines, one indicating that the arrestee read the form, and one indicating that the arrestee understood the rights and desired to waive them. According to Detective Sacks, the Defendant placed his signature in both places. Detective Sacks testified that he had not threatened or coerced the Defendant and stated that he had made no promises to the Defendant.
Based on the foregoing, we find that the present case is similar to State v. Brown, 414 So.2d 689 (La.1982) and Green. In this case, there was no expert testimony that the Defendant was unable to understand his rights or the ramifications of *354 waiving his rights when he made the statements. Dr. Gandle stated at trial that she was not testifying regarding Defendant's capacity on September 18, 1997, the day of the statements. Rather, the expert testimony related only to the Defendant's ability to apply his legal rights at trial. Further, the statements seemed lucid. They evidenced an understanding by the Defendant through his attempt to exculpate himself. There was no evidence of psychosis. Also, the Defendant had a familiarity with his rights from a previous court experience.
Thus, although the record supports that the Defendant had a diminished mental capacity, we do not find that the Defendant proved that this mental defect robbed him of his ability to understand his rights and the consequences of the waiver of those rights. Therefore, we find no error in the trial court denial of the Defendant's motion to suppress his statements. This assignment of error has no merit.

ERROR PATENT REVIEW
The Defendant requested a review of the record for errors patent. We reviewed the record according to La.C.Cr.P. art. 920, for errors patent, any error discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence. State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990).
We find that the trial court erred in failing to properly inform the Defendant at the time of sentencing of the prescriptive period for post-conviction relief as provided in La.C.Cr.P. art. 930.8. Although the commitment states that the Defendant was so advised, the transcript does not reflect it. When there is a conflict between the transcript and the minute entry, it is the transcript that prevails. State v. Lynch, 441 So.2d 732 (La.1983).
Therefore, we remand the case to the trial court with instructions for the trial court to send appropriate written notice to the Defendant of the correct statement of the law regarding the prescriptive period for post conviction relief and to file written proof in the record that the Defendant received the notice. See. State v. Stelly, 98-578 (La.App. 5th Cir.12/16/98), 725 So.2d 562.
Accordingly, for the reasons set out above, the Defendant's conviction for second degree murder and his sentence to life in prison without benefit of parole, probation or suspension of sentence are affirmed. The case is remanded to the trial court to provide proof in the record of the Defendant's receipt of appropriate notice, under La.C.Cr.P. art. 930.8, of the prescriptive period for post conviction relief.
CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED.
NOTES
[1] Deputy Parker did not specify a time of the shooting. However, she stated that she was about to conclude working the night shift, which ends at either 6:30 or 7:00 a.m., depending on the starting time, which is either 10:30 or 11:00 p.m.
[2] Deputy Parker testified that the only witness with whom she spoke was Simmons, Sr., not Simmons, Jr. It is not clear whether Sergeant Bussard erroneously named Simmons, Sr. at trial, or whether Simmons, Jr. actually was the person who identified the van.
[3] The substance of Dohre's remarks are essentially the same as the content of the document filed at the sanity hearing on December 7, 2000, with the exception of the information about the Defendant's preaching to the jury.
[4] The opinion on rehearing does not affect the instant discussion. The Louisiana Supreme Court granted the state's application for rehearing and reinstated the defendant's conviction of first degree murder and the death penalty. In the first opinion, the court had reversed defendant's first degree murder conviction, concluded that the evidence was sufficient to support a second degree murder conviction, and remanded for re-sentencing.
[5] La.R.S. 14:30.1(A)(2)(a) defines second degree murder as the killing of a human being "[w]hen the offender is engaged in the perpetration or attempted perpetration of" certain enumerated felonies, including armed robbery, "even though [the offender] has no intent to kill or to inflict great bodily harm."