919 So.2d 738 (2005)
STATE of Louisiana
v.
Patrick L. BRASSEAUX.
No. 05-KA-41.
Court of Appeal of Louisiana, Fifth Circuit.
December 13, 2005.
*739 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, Roger Jordan, Martin A. Bellanger, Jr., Assistant District Attorneys, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
*740 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA, and JAMES C. GULOTTA, Pro Tempore.
JAMES L. CANNELLA, Judge.
The Defendant, Patrick Brasseaux, appeals from his conviction of second degree murder and his sentence to life imprisonment. For the reasons which follow, we affirm.
On October 24, 2002, the Jefferson Parish Grand Jury issued an indictment charging the Defendant with the second degree murder of Charles Stevens (Stevens). The Defendant was arraigned on October 25, 2002 and pled not guilty. On February 4, 2003, the trial court heard and denied defense motions to suppress statements and evidence. The Defendant was tried by a twelve person jury on May 3-7, 2004. At the close of trial, the jury returned a unanimous verdict of guilty as charged.
On June 21, 2004, the Defendant filed a Motion for New Trial and the trial court heard arguments and denied it. The Defendant waived statutory delays, and the trial court sentenced him that day to the mandatory term of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. The Defendant filed a timely Motion for Appeal on June 21, 2004. The trial court granted the motion on that day.
It is noted that, while the Defendant is represented by appointed counsel on appeal, he filed a Motion for Leave and Extension to File Pro Se Supplemental Appeal and Transcribe Voir Dire in this Court on March 17, 2005. On March 21, 2005, the Defendant's request for a voir dire transcript was denied, but his request to file a "supplemental appeal," was granted, returnable on April 20, 2005. As of this date, the Defendant has not filed a pro se brief in this matter. On appeal the Defendant has assigned two errors.

FACTS
Stevens' mother, Lucille Thompson (Thompson), testified that in March of 2002, he lived by himself in an apartment in Metairie, and she lived in Covington. Thompson said that she spoke to her son on the telephone at least once each day, and he visited her at her Covington home at least once a month.
Thompson testified that on Sunday, March 24, 2002, her son visited her at her home from 11:00 a.m. until 5:00 p.m. He then left her house in his automobile, a four-door Dodge Intrepid, for the 45 minute drive back to his apartment. Thompson telephoned Stevens' apartment between 6:30 and 8:30 p.m., but he did not answer. Thompson telephoned her son's apartment over the next two days and did not get an answer. On Tuesday, March 26, 2002, she telephoned his employer and was told that her son had not shown up for work on Monday or Tuesday. Thompson testified that it was unusual for her son to miss work.
Later on Tuesday, after speaking with his employer, Thompson went to Stevens' apartment to check on him. She noted that his car was not there. Neither Thompson nor an apartment complex manager was able to unlock the door. Thompson enlisted the help of Richard Lachney(Lachney), an air conditioning technician who worked at the apartment complex. Lachney unlocked the door and he and Thompson entered the apartment.
Lachney testified that it was hot inside the apartment and there was a stale smell. The electric stove and the heater were *741 both running, although it was not a cold day. Thompson testified that her son was ordinarily a neat person, but the apartment was messy. Lachney turned off the heater while Thompson turned off the stove. Lachney noted that there was a bed sheet covering a chair in the living room. He removed the sheet and saw Stevens' body. Thompson testified that the body was black and swollen. Lachney called 9-1-1 and police officers arrived at the scene within fifteen minutes.
Detective Donald Clogher of the Jefferson Parish Sheriff's Office (JPSO) conducted the investigation at the apartment. Stevens' body, which was in an advanced stage of decomposition, was sitting upright in a chair. The body was clothed in a red bathrobe, and was partially covered by a bed sheet. There was a rope around his neck.
Among the items collected as evidence from the apartment were the rope, the bed sheet, three cigarette butts, an article of women's underwear, and photographs of a man dressed in women's clothing. Lieutenant Steve Buras, commander of the JPSO Homicide Division, testified that he submitted the cigarette butts for DNA testing.
Detective Clogher was told that the victim's vehicle was missing. He was unable to find keys to the car or the apartment at the scene. Lieutenant Grey Thurman of the JPSO Homicide Division testified that he entered the car in a national computer database of stolen vehicles.
Melanie Kemp (Kemp) was called as a trial witness by both the State and the defense. She testified that she became acquainted with the Defendant in early 2002. Kemp testified that she was the Defendant's girlfriend. Both Kemp and the Defendant were "squatters," meaning that they lived in abandoned buildings or with friends.
Kemp testified that the Defendant had told her about his friend "Charlie" in Metairie. The Defendant sometimes called him "Transvestite Charlie." The Defendant occasionally told her that he was going to see Charlie in Metairie to take care of some business. Kemp and the Defendant both used cocaine and heroin on a regular basis, and she assumed that the Defendant's "business" with Charlie had to do with drugs.
On Sunday, March 24, 2002, the Defendant told Kemp that he was going to Metairie. She next saw him at 10:00 that night in front of The Hideout, a bar on Decatur Street in the New Orleans French Quarter. The Defendant arrived in a car that she had not previously seen. When she asked him how he had obtained the car, the Defendant told her that someone who owed him money had given it to him in lieu of payment. Kemp got into the car with the Defendant, they bought cocaine from a man she knew only as "Bob" and spent the rest of the night riding around and using cocaine. Kemp testified that the back seat of the car was cluttered with clothing and other items.
On March 25, 2002, the Defendant and Kemp picked up the Defendant's friends, Joni Schwartz (Schwartz) and Charles Wilkerson (Wilkerson). The Defendant wanted to pawn some of the items in the car and they tried several pawn shops. The Defendant, Schwartz and Wilkerson went into the shops, and Kemp stayed in the car. While driving around, the group bought cocaine and heroin from Bob and used the drugs. Kemp testified that while they were there, she heard the Defendant say that he had tied up "Charlie," and that he was going back later to "finish him off." The Defendant made some joking comments about Charlie, calling him a "fag."
*742 Schwartz testified that she was acquainted with the Defendant for a period of two and one-half months in 2002. She only knew him as "Smack." She also knew Kemp, whom she called "Blue." Schwartz testified that on March 24, 2002, the Defendant spoke to her about his Metairie homosexual friend. The Defendant did not tell her the man's name or the nature of their relationship. The Defendant told Schwartz that this friend used cocaine. He planned to give the man a hit of heroin, telling him it was cocaine. While the man was under the influence of the drug, the Defendant would rob him.
Schwartz testified that she next saw the Defendant at 9:00 p.m. on March 24, 2002. She was in the French Quarter with her boyfriend, Wilkerson. The Defendant was driving a champagne colored four-door car that she had not seen before. She and Wilkerson got into the car, and the Defendant asked her to telephone "Bob," their drug dealer. The Defendant had some items in the car that he wanted to give to Bob in exchange for heroin. There was a microwave oven on the back seat, and a large plastic container which held various "knickknacks."
Schwartz telephoned Bob, and set up a meeting. Schwartz testified that while they waited for Bob to arrive, the Defendant told her and Wilkerson that he had hit a man with heroin, and the man "nodded out." The Defendant said that he then tied up the man, put tape over his mouth, and put him in a bathtub. He also said that the car and the property inside it belonged to that man. The Defendant did not tell them the man's name, but referred to him as "the guy."
When Bob arrived, the Defendant showed him a computer in the trunk of the car. Schwartz also saw a video cassette recorder (VCR). She did not know whether the Defendant received any drugs from Bob at that time. At about 10:00 p.m., the Defendant drove Schwartz and Wilkerson to her home on Marigny Street in New Orleans. They brought the microwave oven and the VCR into the house for safekeeping. They arranged to meet the next day to pawn those items, along with the computer.
Schwartz testified that the Defendant picked up her and Wilkerson on Monday morning, March 25, 2002, accompanied by Kemp. Schwartz testified that they put the microwave oven and the VCR back into the car, and went to a pawn shop on Old Gentilly Road in New Orleans. They brought the three items into the shop. They were able to pawn the microwave and the VCR there, but not the computer. Schwartz testified she was the only one of the group with the proper form of identification, so she completed the transaction. They were able to pawn the computer at a pawn shop on Magazine Street. The police questioned her about the pawned items about a week later.
Kemp testified that when she saw the Defendant on Tuesday, March 26, 2002, he was still in possession of the car. He asked her if she wanted to leave the city with him. She agreed to the trip because she wanted to visit her family in New Mexico. The Defendant told her that a young couple would be going along with them and would share the cost of gasoline.
Kenneth Pawelski (Pawelski) testified that he arrived in New Orleans on March 23, 2002 with his girlfriend, Brandi Pace (Pace). He came to the city hoping to locate some friends. He met Kemp at Jackson Square. He saw Kemp again at the Drop-in Center on North Rampart Street, a free clinic for people living on the street. Pawelski also met the Defendant there. The Defendant told Pawelski that he had bought a car, and that he planned to travel west. Pawelski testified that he *743 asked the Defendant to take him and Pace along because they wanted to go to California. The Defendant agreed to take them.
Kemp testified that they started west on the night of Wednesday, March 27, 2002. The next morning, the group entered Lafayette. The Defendant told the others that he wanted to visit his family, who lived there. Kemp testified that the Defendant told them all to call him "Dante Marcello" if they were stopped by police, since he had an extensive criminal record in that city.
Kemp said that the group got some food at a Taco Bell restaurant and stopped in a motel parking lot nearby to eat it. Soon thereafter, five police cars entered the parking lot and officers took them out of the car at gunpoint.
Corporal Randall Leger of the Lafayette Police Department testified that he was on patrol at 10:00 a.m. on March 28, 2002, when he saw a 1994 Dodge Intrepid. He made eye contact with one of the rear seat passengers. Based on the subject's facial expression, he sensed something was not right. He requested that the car's license plate number be run on the police computer system. He eventually lost sight of the vehicle. Corporal Leger received information that the car had been reported stolen, and that it was related to a homicide investigation. He put out a call to other officers to look for the vehicle.
Corporal Jessica Guidry, another patrol officer, spotted the vehicle 30 to 60 minutes after hearing the stolen vehicle call. It was in the rear parking lot of the Travel Host South Motel on the Northeast Evangeline Thruway. She reported the sighting to the police dispatcher and several additional officers responded. Corporal Guidry and other officers performed a felony takedown. The Defendant was the car's driver. Kemp was the front seat passenger, and Pace and Pawelski were the back seat passengers. Corporal Guidry testified that each suspect was transported to the police station separately. Lieutenant Thurman testified that on March 28, 2002, the Lafayette Police Department notified him that Stevens' car and its occupants had been taken into custody. Lieutenant Thurman and another officer drove to Lafayette that day. When Lieutenant Thurman arrived at the police station, he found the Defendant in an interview room, kicking and screaming that he wanted to know what was happening. Lieutenant Thurman explained to him that he was assigned to investigate the case. He told the Defendant that he was being charged with possession of the stolen vehicle, and that he was also being investigated with respect to Stevens' death.
Lieutenant Thurman advised the Defendant of his Miranda[1] rights using a standard rights form. The Defendant indicated that he wished to waive his rights and submit to an interview. Lieutenant Thurman questioned the Defendant and the interview was tape recorded and transcribed. A redacted version of the tape was played at trial.
During the interview the Defendant said that he had met Stevens for the first time three weeks earlier in front of The Corner Pocket, a gay bar in the French Quarter. Stevens, who was gay, initially mistook the Defendant for a prostitute. The Defendant learned that Stevens was a drug user and he began selling Stevens narcotics on a regular basis. The Defendant sometimes delivered cocaine to Stevens' apartment, and had even injected Stevens with the drug. The Defendant said that he had *744 seen evidence in the apartment that Stevens used inhalants.
The Defendant told Lieutenant Thurman that he had last seen Stevens in front of the Funky Butt lounge on North Rampart Street on Friday or Saturday morning. He gave Stevens his laundry to wash, along with some cocaine to compensate him. Stevens told the Defendant that he planned to wash the laundry at his mother's house. The Defendant said that he was last at Stevens' apartment on Thursday or Friday. Stevens' computer was there at that time, as well as two televisions and a VCR.
The Defendant said that Schwartz called him to say that she was with Stevens, and that he wanted some heroin. The Defendant said that he had seen Schwartz with Stevens once or twice before. He did not know Stevens to use heroin, although Schwartz did. Stevens telephoned the Defendant at a pay phone near where he was living and offered to "rent" him his car for a week in exchange for some heroin. Schwartz and a young man whom the Defendant knew as "Mouse" delivered Stevens' car to the Defendant sometime on Monday or Tuesday. The Defendant told Thurman that he picked up Kemp and his other two passengers after he took possession of the car. The young couple was hitchhiking and had agreed to help him pay for gasoline in exchange for a ride west.
Lieutenant Thurman testified that after the interview was completed, the Defendant gave him his written consent to obtain hair and blood samples and an oral swab. Lieutenant Thurman transported the Defendant to University Medical Center in Lafayette to have the blood sample drawn. The other samples were taken at the police station. Gregory Harrell (Harrell), an expert in forensic analysis of DNA, tested the three cigarette butts found at the crime scene against reference samples from Stevens and the Defendant. Harrell testified that one of the cigarette butts had DNA consistent with that of the Defendant.
As they were leaving the hospital, the Defendant told Lieutenant Thurman that he wished to change his statement. Lieutenant Thurman told the Defendant that he still had the rights he had been advised of earlier. The Defendant submitted to, in a police car in the hospital parking lot, a second recorded interview which was transcribed. During that interview, the Defendant said that he had given Schwartz and her boyfriend, Wilkerson, a ride to a pawn shop. Schwartz told the Defendant that she had a VCR to pawn, but he did not see the VCR. He saw Schwartz carry a box into the pawn shop.
Lieutenant Thurman testified that he recovered Stevens' Compaq computer from New Orleans Pawn Shop on Magazine Street. The pawn sheet showed that Schwartz had pawned the computer and a printer for $70. From Cash America Pawn on Gentilly Boulevard in New Orleans, Lieutenant Thurman recovered a Samsung microwave oven and a Panasonic VCR. The pawn sheet showed that those items were pawned by Schwartz for $40 on March 25, 2002.
Lieutenant Buras testified that Stevens' car was towed to an enclosed garage at the Detective Bureau of the Jefferson Parish Sheriff's Office. He obtained a search warrant for the vehicle. Among the items seized in the search was Stevens' wallet, containing his Social Security card and driver's license. Also recovered was a black pouch containing cotton dabbers, ten hypodermic needles, syringes, a measuring spoon, small plastic zip-lock bags, and various other items. A leather briefcase belonging to Stevens was found in the vehicle. A blue pouch inside the briefcase *745 contained credit cards bearing Stevens' name.
Among the items recovered in the vehicle search was a piece of paper with handwritten names and corresponding telephone numbers. One of the names and numbers was for a person named Dani Claire Dailey (Dailey), a former girlfriend and now a friend of the Defendant's. Dailey and another friend of the Defendant's, Tara Russell (Russell), testified regarding their acquaintance with the Defendant and their lack of acquaintance with Stevens. They also provided their telephone numbers. A Bellsouth employee, Kathleen Sherer, testified, linking calls made from Stevens' apartment on Sunday March 24, 2002 to Dailey and Russell, whose telephone was in the name of her boyfriend, Q. Ross, friends of the Defendant's.
Dr. Karen Ross, an expert in forensic pathology, employed by the Jefferson Parish Coroner's Office, testified that Dr. Gillen Rudner had performed an autopsy on Stevens, but that Dr. Rudner was now living in another state. She reviewed the autopsy protocol, along with the autopsy and scene photographs in preparation for her testimony. Dr. Ross testified that Dr. Rudner made note of a ligature wrapped three times around Stevens' neck. Upon removal of the ligature, Dr. Rudner found that there was an abraded furrow around the neck. Dr. Rudner determined the cause of death to be asphyxia due to ligature strangulation. Dr. Ross explained that a ligature such as a rope was placed around the neck and cut off the blood or oxygen to the brain. Dr. Ross testified that a slight maximal suspension point behind the right ear made it likely that the perpetrator was standing behind Stevens, and the ligature was slightly pulled up behind the right ear. Dr. Ross testified that the toxicology report showed Stevens had morphine in his blood at the time of death. She explained that morphine can be derived from heroin, and that a finding of morphine in the blood is consistent with someone being given heroin.
Dr. Rudner classified Stevens' death as a homicide. Dr. Ross concurred with the finding, saying the death was consistent with a homicidal ligature strangulation.
The Defendant testified at trial that, at the time of his arrest, he had been in New Orleans for six to eight months. He lived in various locations, and occasionally squatted in vacant buildings. He was a drug dealer, and Bob supplied him with the cocaine and heroin that he sold. The Defendant also used drugs. About three or four weeks before his arrest, he met Stevens outside a bar in the French Quarter. He began selling Stevens cocaine on a regular basis. Their usual meeting place was in front of the Funky Butt lounge on North Rampart Street. The Defendant also brought drugs to Stevens at his Metairie apartment. The Defendant testified that he was at Stevens' apartment on five separate occasions and each time he brought the victim drugs. He sometimes injected Stevens with cocaine.
The Defendant testified that the last time he saw Stevens was in front of the Funky Butt on the morning of March 23 or 24, 2002. Stevens was going to wash clothes, and offered to wash the Defendant's clothes too. The Defendant gave Stevens some articles of clothing, and they parted company.
Sometime later, the Defendant saw Schwartz and a man he knew only as "Mouse" in the victim's car. They told the Defendant that they needed some cocaine for Stevens. The Defendant obtained the cocaine and gave it to Schwartz. On another occasion, Schwartz telephoned the Defendant and asked him to obtain heroin, saying it was for Stevens. The Defendant testified that he did not believe her, as he *746 had not known Stevens to use heroin. He nevertheless got her the heroin.
The Defendant said that Schwartz showed up later, offering to rent him Stevens' car in exchange for heroin. After some resistance, the Defendant agreed to the arrangement. He assumed Schwartz was acting on Stevens' behalf. Schwartz and Mouse turned over the car to the Defendant.
Schwartz and Wilkerson later asked the Defendant to drive them to Gene's Po-Boys to meet with Bob. They had two boxes containing something they wanted to give Bob in exchange for drugs. The Defendant agreed to give them a ride, and they put the boxes in the car's trunk. The Defendant testified that he did not know what was inside the boxes. While the Defendant stayed inside the car, Schwartz and Wilkerson showed Bob what they wanted to trade. The Defendant heard Bob say he could not take the items.
The Defendant testified that he convinced Bob to give Schwartz and Wilkerson some drugs with the understanding that they would pay him the next day. Bob agreed. The Defendant planned to take his friends to pawn shops the next day to pawn whatever was inside the boxes. The Defendant then drove them back to Schwartz' house. The Defendant picked up his girlfriend, Kemp, and the two smoked marijuana together. They rode around and talked until early morning. Then they picked up Schwartz and Wilkerson.
The Defendant testified that he drove Schwartz and Wilkerson to two pawn shops, where they disposed of the two boxes. They met Bob later in the day and obtained drugs from him. They drove to the Lakefront, where they used the drugs which they had bought. The Defendant testified that he never spoke of a plan to shoot up a man with dope, or of tying up someone.
The Defendant said that he and Kemp met Pace and Pawelski in the French Quarter and learned that the couple wanted to go to Sacramento, California. He offered them a ride. They set out late on the night of March 27, 2002. They spent part of the night at a rest stop outside of Lafayette. In the morning they drove into Lafayette. The Defendant testified that he intended to visit his mother, who lived there. First, they stopped at a Taco Bell restaurant and bought some food. He parked in a motel parking lot in order to eat. Soon thereafter, about ten police cars converged on the parking lot and officers ordered the Defendant and his companions to get out of the car.
The Defendant testified that he was transported to the Lafayette police station, where he was placed in an interrogation room. When Lieutenant Thurman arrived, he asked the Defendant if he wanted to talk, and the Defendant agreed. The Defendant testified that he spoke to Thurman freely, and of his own volition. The Defendant denied that he injected Stevens with heroin on March 24, 2002, or that he strangled Stevens with a rope.

ASSIGNMENT OF ERROR NUMBER ONE
By this assignment of error the Defendant argues that the trial court erred in denying his mistrial motion after a State witness, Kemp, testified about his criminal record. More particularly, on the first day of trial, Kemp testified that the Defendant told her and the other occupants of the car that, if they were stopped by police in Lafayette, they should say that his name was Dante Marcello, because "he had a long record in Lafayette." When Kemp's testimony concluded, two more witnesses testified before the trial recessed for the day. At the beginning of the second day *747 of trial, the Defendant moved for a mistrial, and the trial court denied the motion. The trial judge further stated that she would admonish the jury to disregard any evidence of other crimes.[2]
At the outset, we find that the Defendant's mistrial motion was not timely made. State v. Broaden, 99-2124, p. 17 (La.2/21/01), 780 So.2d 349, 361, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001). Counsel did not object to the testimony at issue at the time it was given, or even at the conclusion of Kemp's testimony. He waited until the beginning of the following day to move for a mistrial. Official Revision Comment (b) to Article 770 of the Code of Criminal Procedure provides, "A failure to move for a mistrial is a waiver of the error, since this article requires a motion by the Defendant." See, State v. Broaden, supra, in which the Louisiana Supreme Court held that the defendant's objection to the elicitation of other crimes evidence by the State was untimely where the defense attorney waited until after the witness at issue left the stand, and the jurors were removed for a lunch break. The Broaden court found, in circumstances similar to those here, that the Defendant had failed to preserve his claim for appeal.
Since the Defendant in this case waived the error, we need not address the merits of his claim. However, we point out that, even if addressed on its merits, this assignment of error does not warrant reversal of the conviction.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is inadmissible at trial due to the risk of grave prejudice to the defendant. State v. Williams, 01-1007, p. 7 (La.App. 5th Cir.2/26/02), 811 So.2d 1026, 1030. Two procedural articles address the remedies for admission of such evidence. La. C.Cr.P. art. 770 provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
....
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible[.]
La.C.Cr.P. art. 771 provides, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
....
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
As a general rule, article 770 does not apply to testimony by a State witness, since a witness is not considered a *748 "court official" for purposes of the article. But an impermissible reference to another crime deliberately elicited by the prosecutor is imputable to the State, and therefore triggers the rule mandating a mistrial. State v. Marsalis, 04-827, p. 6 (La.App. 5th Cir.4/26/05), 902 So.2d 1081, 1085. In the instant case, there is no showing that the prosecutor purposefully elicited the complained of response from the witness. In fact, defense counsel stated that he did not believe the prosecutor had intentionally elicited the testimony. Therefore, article 770 is not applicable.
Further, Kemp's testimony was not grounds for a mistrial under Article 771. The trial court admonished the jury concerning the remark and there is no showing that the admonishment was not sufficient for such a minor reference. In this instance, Kemp did not refer to any specific offenses alleged to have been committed by the Defendant. Rather, her testimony was a general reference to the Defendant's statement that he had a "long record."
A mistrial is a drastic remedy, warranted only if a comment or remark results in substantial prejudice to the accused. State v. Broaden, 99-2124 at p. 16, (La.2/21/01), 780 So.2d at 360, fn. 5; State v. Marsalis, supra. The Defendant did not suffer substantial prejudice based on the challenged testimony. The Defendant himself gave extensive testimony regarding his criminal convictions. Moreover, he gave considerably more testimony regarding his use and sale of narcotics than did any of the State's witnesses. Therefore, we find no merit in this assignment of error.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error, the Defendant argues that the trial court erred in excluding photographs of the victim because they would have supported his defense. More particularly, the Defendant complains that the trial court's exclusion of photographs of the victim wearing women's lingerie and clothing violated his constitutional right to put on a defense.
In the search of Stevens' apartment, investigating officers recovered several Polaroid photographs depicting the victim wearing women's garments. Some of the photographs portrayed the victim in suggestive poses, with his buttocks exposed. At the beginning of trial, the State filed a Motion in Limine, asking the court to exclude the photographs. Defense counsel argued that he planned to show, as part of his case, that the victim's death was the result of autoerotic asphyxiation. He submitted that the photographs would support that defense by showing the victim had "certain perverted sexual preferences and so forth."
The State countered that there was no evidence that the victim was involved in autoeroticism, and that the photographs were irrelevant. The trial judge decided to defer her ruling on the matter until such time as the defense sought to introduce the photos. During the cross-examination of State's witness Detective Clogher, the trial judge viewed the photographs out of the jury's presence. She ruled that she would exclude those photos that depicted nudity and/or suggestive poses, as they had no probative value. The trial judge said that she would allow defense counsel to show the remaining two or three photos to the detective for identification purposes only. She ordered counsel not to publish any photos to the jury at that time. Detective Clogher thereafter identified those photos as the ones found at the victim's apartment.
*749 Near the end of trial, the Defendant identified Stevens as the subject of the Polaroid photographs. Defense counsel again sought to introduce and publish the photos. The State objected to admission of the photographs, arguing that they were irrelevant. Out of the jury's presence, defense counsel argued that the photos were clearly taken by someone with whom the victim shared a very personal relationship. Counsel wished to use the photographs to support the argument that someone other than the Defendant (such as the person who took the photos) was in a position to commit the murder.
The trial judge ruled that she would exclude all photographs that involved "various leg shots, rear end, buttock shots, lingerie shots, and stockings that I find offensive." She further ruled that she would allow the defense to introduce only one photo that depicted the victim in women's clothing, one which did not depict an obscene position or nudity. The judge reasoned,
Well, anytime you have a victim's home where there's a body recovered, photographs of the victim in any clothing doesn't substantiate that somebody else is the murderer. And these photos I know, for the Record (sic), are Polaroid, the type of cameraI don't know what they're calledthat shoots out the photograph. They appear very old. They are scratched. They are scraped. They smell of age, and the condition of the photographs alone in the state that they're in depict them to be old. Therefore, I don't think they have any proximity to the time frame of this murder.
Defense counsel thereafter introduced one photograph, Defense Exhibit 15A. The Defendant now complains that the trial court abused her discretion in failing to allow all of the Polaroid photographs to be admitted.
Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. However, this right does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. La. C.E. art. 403; State v. Mosby, 595 So.2d 1135, 1138 (La.1992); State v. Pugh, 02-171, p. 17 (La.App. 5th Cir.10/16/02), 831 So.2d 341, 351. Relevant evidence is defined by La. C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Irrelevant evidence is inadmissible. La. C.E. art. 402.
In general, photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, are admissible, assuming that their probative value outweighs any prejudicial effect. State v. Battaglia, 03-692, p. 10 (La.App. 5th Cir.11/25/03), 861 So.2d 704, 710, writ denied, 04-1701 (La.4/29/05), 901 So.2d 1058. An appellate court generally places great weight upon the trial court's ruling regarding the relevancy of evidence, and such a determination will not be reversed absent a clear abuse of discretion. Battaglia, 03-692 at p. 10, 861 So.2d at 711.
In this case we find that the trial judge did not abuse her discretion in finding that the prejudicial effect of the excluded photographs outweighed their probative value. As she noted, it is apparent from their appearance that the Polaroid photos were not taken near in time to the *750 murder. Therefore, the Defendant's assertion that they might have been used to show the photographer was a possible perpetrator has no merit.
The Defendant's argument that the photographs were necessary to support his claim that Stevens caused his own death through autoerotic asphyxiation also lacks merit. Dr. Ross explained that autoerotic asphyxiation is an act by which a person applies a ligature or other mechanism to himself to cut off his blood supply for a sufficient time to enhance an orgasm. In her opinion, it was extremely unlikely that the victim's injury was self-inflicted in that way. She stated that, in cases of autoerotic asphyxiation, the subject typically puts padding around the ligature so as to avoid leaving marks on the neck. The doctor also felt that the number of loops around the victim's neck was not consistent with self-inflicted asphyxiation. Normally, one who engages in autoerotic asphyxiation leaves himself some escape mechanism. Also, there is usually some type of pornographic material nearby in cases of autoerotic asphyxiation. That was not the case here. Finally, the doctor said she would not expect to find a sheet covering the entire body in a case of self-inflicted asphyxiation.
The court's suppression of some of the photographs did not prevent the Defendant from proceeding with his chosen defenses. Through the one photograph which the trial court allowed, he was able to show that Stevens was a cross-dresser. The Defendant testified that he saw the victim dressed in women's clothing on at least one occasion. There was also testimony that a piece of women's underwear was found in the victim's apartment. Thus, we find no error in the trial court ruling that excluded the prejudicial photographs and we find no merit in the Defendant's argument that he was deprived of his constitutional right to present a defense. This assignment of error has no merit.

ERRORS PATENT DISCUSSION
The record was reviewed for errors patent. La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990). The review reveals no errors.
Accordingly, for the reasons set out above, we affirm the Defendant's conviction for second degree murder and his sentence to life in prison at hard labor.
AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The court did, in fact, instruct the jury that it could not convict the Defendant for the crime charged based on evidence of other crimes.